ODOM, J.
 

 This is an expropriation suit brought by' the city of Shreveport to acquire title to 10.31 acres of land belonging to defendants for a site on which to locate an additional unit of its waterworks plant.
 

 The jury found for plaintiff and fixed the value of the land at $500 per acre, or $5,155 for the tract, and rejected defendant’s demand for damages to the remaining portion of the tract. There was judgment in accordance with this finding, and defendants appealed.
 

 The right of the city to expropriate the land involved is now conceded, and defendants have waived their claim for damage to the remaining portion of the tract, so that the the only question before this court is whether defendants have been allowed adequate compensation for the land taken.
 

 They contend that the actual, true value of the land before the contemplated improvement was proposed, was $1,000 per acre, and they ask that the award be increased to that amount.
 

 These defendants owned a tract of land consisting of 28 acres, located about four miles from the courthouse in Shreveport, and on the edge of the city limits. There are no improvements on the land nor has it ever been cultivated. It lies adjacent to the right of way of the Kansas City Southern Railroad on one side and a paved highway on the other. Its proximity to the railroad makes it suitable for factory sites and for the location of industrial plants. The tract can be subdivided into lots and used for residential purposes, although it is hilly and broken, with ravines traversing portions of it. It is adjacent or near to that portion of the city inhabited almost exclusively by colored people, and the witnesses all say it could be developed as a negro subdivision and settlement, and some of them say that if it were subdivided into lots, the lots, or some of them at least, might be sold to negroes, although the testimony is to the effect that there is little demand, if any, at the present time for such lots, especially in view of the fact that there are many such lots now on sale at reasonable prices in negro settlements nearer the city. There is no testimony showing that there is any present demand for factory sites in that vicinity. It does not appear that there have been any recent sales of similar property in that immediate vicinity, except a lot sold to the railroad company and one to a gas company. But the prices paid for these lots, located as they are, furnished no basis for-an estimate of the value of the land expropriated; the lots sold being small in area and so situated as to make them necessary for the purposes desired.
 

 Therefore the value of this property is uncertain and as to what it may eventually be worth depends upon the growth and development of the city. As some of the witnesses expressed it, it is property which “may come in later.”
 

 
 *147
 
 The 10-aere plot needed by the city is rectangular in shape and is practically in the center of the main tract. It has a frontage of about 600 feet on the railroad and runs back to the Gas Center road, which is paved.
 

 It is contended by the city that from the standpoint of desirability for residence lots the plot of land desired is below the average of’ the whole tract, due to the fact that it is more broken and portions of it lower than the surrounding territory. It is true that the land sought embraces the lowest portion of the entire tract, but the testimony shows that all of it can be used for residence lots, and due to the fact that it has considerable frontage both on the railroad and the paved highway our conclusion is that as to value it is a fair average of the entire tract.
 

 As touching the value of the property, eleven citizens of the city, all engaged in the business of buying, handling, and selling real estate, were called as witnesses, five by the city and six by the defendants. Each of those called by the city testified that the land was worth $500 an acre. Of those called by defendants, three said it was worth $900, one that it was worth $800, and two that it was worth $1,000 per acre. The witnesses, both for plaintiff and defendants, are all citizens of high standing, experienced in the real estate business, of equal credibility, and so far as the record discloses are without bias or prejudice and have no interest whatever in the controversy. It is suggested, however, that some at least of those called by ■defendants are bulls in the real estate market because they themselves have for sale real estate of similar character. That fact may have influenced them to some extent but certainly not to the extent of being intentionally unfair.
 

 The five who testified for plaintiff compose the board of appraisers for the Shreveport Real Estate Association. Previous to the trial these men were asked to visit the property and appraise it. They did so and reported that it was worth $500 per acre. This report seems to have been concurred in by each member of the board, but whether that figure represented the individual opinion of each at the time the examination was made and before the report was agreed upon does not appear. When called as witnesses at the trial, each one testified that in his opinion the report was correct. It is highly probable, we think, that if these men had not conferred together as a committee or board and had been called to testify separately and without reference to their report, they would have differed to some extent at least in their estimate of the value of the land, for it is not probable that the five men would have agreed to the cent on the value of the tract of land if they had not previously consulted and agreed upon a report to be made.
 

 The record discloses - that the late O. O. Herndon owned an undivided one-half interest in the land, which interest was sold at public auction by the administrators of his succession on April 13, 1928, less than two years previous to the date on which this suit was filed, at which sale his widow became the purchaser at $611 per acre. There were competitive bids, and the presumption is that the price paid represented the then market value of the land. Some of the witnesses testified that there was no shrinkage in the value of property in that vicinity between the date of the sale and the date on which the case was tried, and their testimony on that point is not disputed.
 

 As stated, the witnesses had no precedent to guide them in fixing the value of the land, as there had been no recent sales of similar property similarly located, and the property being unimproved has produced no revenue.
 
 *149
 
 So that there was no substantial basis for the fixing of the value at the time the suit was tried.
 

 But in view of the fact that the property had, less than two years previously, sold at public auction for $611 per acre and that there had been no shrinkage in value, and in view of the further fact that each of the defendants’ witnesses thought the property worth considerably more than $500 per acre, we think the jury’s award is inadequate.
 

 In expropriation proceedings verdicts of juries composed of freeholders of the parish' as to the value of the property are entitled to great respect, and it is a rule of long standing that unless such verdicts are manifestly erroneous they will not be disturbed by an appellate court.
 

 The jurors are supposed to possess •some personal knowledge of property values, and as they are clothed to some extent with the character and authority of experts, they may exercise, in part at least, their individual judgment in fixing the valúe of the property to be taken. But they are not authorized to fix the value solely according to their own private opinion, even when they themselves inspect the property. On the con-, trary, it is their sworn duty to consider and give weight to all the testimony, if not discredited.
 

 In the case of Postal Telegraph Cable Company v. Railway Company, 43 La. Ann. 522, 9 So. 119, 120, the court formulated the following rule:
 

 “It has long been held in this state that the jury of freeholders, authorized by our laws to act in expropriation proceedings,, have, to some extent, the character and authority of experts, supposed to have some personal knowledge of the matters submitted to them, and authorized to rely on their own opinions, as well as on the testimony adduced before them. Their verdicts are, indeed, subject to review by appeal, and may be amended when manifestly inadequate or excessive; but they are entitled to great respect, and will not be interfered with except in case of gross or manifest error.”
 

 The rule has many times been quoted with approval, notably in the cases of Railroad Company v. Rabasse, 44 La. Ann. 178, 10 So. 708; Railroad Company v. McNeely, 47 La. Ann. 1298, 17 So. 798; Railroad Company v. Heirs of Smith et al., 51 La. Ann. 1079, 25 So. 955; City of Shreveport v. Youree, 114 La. 182, 38 So. 135, 136, 3 Ann. Cas. 300; City of Baton Rouge v. Cross, 147 La. 719, 85 So. S83; and City of Shreveport v. Pedro, 170 La. 351, 127 So. 865.
 

 In the case of City of Shreveport v. Youree, supra, the court, after quoting the above rule or formula, proceeded to clarify and explain it, using the following language:
 

 “It is noted that under this formula the jury are not at liberty to ‘disregard’ the testimony, but that ‘they are authorized to rely on their own opinions, as well as on the testimony adduced before them.’ It leaves them free to consult whatever knowledge they may possess outside of the testimony, and also free to consult their own judgment, and at the same time holds them down to the duty, under their oaths, of giving due weight to the testimony. Far from being authorized to disregard the testimony, they are held bound by it so long as it has not been discredited.”
 

 The jury in this case seem not to have considered the fact that this property had been sold at public auction less then two years previously at $611 per acre, and apparently gave no weight whatever to the testimony of defendants’ witnesses who were not
 
 *151
 
 discredited. In view of all the testimony and circumstances, we think the jury erred, and it is our opinion that the value should be fixed at the price it brought at public auction not long prior to the date of the trial.
 

 It is therefore ordered and decreed that the judgment appealed from be amended by increasing the amount of the award from $5,155 to $6,299.41, and as thus amended it be affirmed. No tender -of the true value of the property having been made to the owner by the city before the proceeding was begun, the city should pay all costs.