ODOM, Justice.
 

 This is an expropriation proceeding brought by the Housing Authority of Shreveport to acquire a plat of ground 80 x 126.25 feet, consisting of Lots 39 and 40 of the Looney Subdivision of the City of Shreveport, together with all the buildings and improvements thereon. The plat of ground, consisting of two lots, has a frontage of 80 feet on Ashton Street and runs back to an alley. A small portion of the northeast corner of Lot 40 is cut off by the right-of-way of the Texas & Pacific Railway Company. But it was agreed that, for the purpose of fixing value, this lot should be considered as having a frontage of 40 feet on Ashton Street. The improvements on the property consist of a residence and two small outbuildings. The Housing Authority alleged that the property had a fair value of $2,650.
 

 The defendants alleged in their answer that the property was worth $6,200. They alleged that Stella H. Green, wife of Sie H. Green, was engaged in teaching music and that, if the property was taken from them, she would lose her music classes and thereby be damaged in the sum of $500; that it would cost them $50 to move from the premises, and that they would be inconvenienced by the moving and they estimated their damage for such inconvenience at $250. They prayed for an award of $7,000. The jury assessed the damage at $3,650. Defendants appealed.
 

 It is admitted that the Housing Authority has the right to expropriate the property. The only questions involved are (1) whéther the jury selected possessed the qualifications prescribed by law and (2) whether the amount of damages assessed by the jury is adequate.
 

 Counsel for defendants stated in his brief at page 5:
 

 “We object to the jury for the reason that eleven of them stated they knew nothing about the property; had never dealt in real estate in Shreveport; had never seen the property; knew nothing about it; had never been on Ashton Street; knew nothing about real estate values in that vicinity, and did not consider themselves experts in real estate.”
 

 
 *468
 
 The qualifications for jurors in cases of this kind are prescribed by Article' 2632 of the Revised Civil Code, as amended by Act 187, page
 
 796,
 
 of 1940. These qualifications are that they shall be “freeholders, residents of the parish in which the land lies, and not interested in the issue to be tried”. It is not claimed by counsel for defendants that the jurors in this case did not possess these qualifications.
 

 The identical question here raised was raised and decided by this court in the case of Louisiana Ry. & Navigation Co. v. Sarpy, 125 La. 388, 51 So. 433, 434. The court said:
 

 “The next of defendant’s grounds is that jurors not entirely competent were forced upon him as members of the jury.
 

 “These jurors were closely examined on their voir dire. They were competent freeholders. One or two in their answers conveyed the idea that they were not competent to determine the value of land. That is not an unusual disclaimer, for many persons do not consider themselves competent to determine the' value of land. If one possesses average common sense, he is a good juror. Ignorance of land value and his inability in that direction are not ground for excluding him. He may discharge the duties of a juror by hearing the testimony, observing closely, and deciding according to the best light before him.”
 

 While this court has repeatedly held that in expropriation proceedings the jurors who are freeholders and residents of the vicinity in which the property sought to be taken is situated are presumed to have some personal knowledge of property values and for that reason are clothed to some extent with the character and authority of experts, and that, while their verdicts are entitled to r.espect and have some weight, yet their verdicts are subject to review and will be amended when manifestly erroneous. City of Shreveport v. Herndon, 173 La. 144, 136 So. 297; Louisiana Highway Commission v. Hoell, 174 La. 302, 140 So. 485; City of New Orleans v. Atkinson, 180 La. 992, 158 So. 363; Louisiana Highway Commission v. Purpera, 187 La. 219, 174 So. 268.
 

 In the following very recent cases, we amended the verdicts of juries because they were found to be manifestly erroneous: Housing Authority v. Weis, 195 La. 224, 196 So. 328; Ouachita Parish School Board v. Clark, 197 La. 131, 1 So.2d 54; Louisiana Highway Commission v. Grey, 197 La. 942, 2 So.2d 654.
 

 In the case at bar, we think the jury manifestly erred and that its verdict should be increased from $3,650 to $4,500.
 

 The property involved is a plat of ground 80 x 126.25 feet, together with a residence and two small outbuildings located thereon. It is in a section of the City of Shreveport inhabited exclusively by Negroes. The Housing Authority called two realtors, Mr. Teat and Mr. Dunn, to estimate the value of the property. Mr. Teat estimated its value at $2,950. Mr. Dunn’s estimate was $2,700. Each said that the plat of ground was worth $800. They differed slightly in their estimates as to the value of the improvements. The Housing Authority tendered to defendants the sum of $3,000, which was refused. The defendant Sic
 
 *470
 
 Green testified that Mr. F. D. Jackson, secretary and manager of the Housing Authority, in the presence of another man not named, offered him $3,500 for the property, which offer he refused. He testified further that at a later date Mr. Jackson, accompanied by Mr. R. E. Jacobs and Mr. McWilliams, came to him and offered to pay $4,000 for the property, which offer he likewise refused. This testimony of Sie Gr.een is not contradicted. Mr. Jackson, Mr. Jacobs, and Mr. McWilliams live in Shreveport, and presumably were available as witnesses. But they were not called.
 

 Mr. Teat, one of the experts called by the Housing Authority to estimate the value of the property, said that the improvements consisted of an old story-and-a-half house, which he estimated was about 50 years old, with brick pillars put together with sand. In describing the house, he said it had “about a six-inch pine floor and a hall going down the west side, a living room, two bedrooms and a kitchen on one side of the hall and a bath and a bedroom on the other side; in the upstairs there are three small attic bedrooms and a room inside used as a storage room. It has all the conveniences, ■ water, light and gas. The house is badly in need of papering and paint inside and out. It is in a state of deterioration from lack of paint and being kept up, it has a cheap light composition shingle roof over the main part of the house and as I understand it, it is about five years old. The roof over the porches is a roll roof that I would say is a year or two old. That is, it looks to be.”
 

 On cross-examination, he testified that the house was old-style, not modern. He was questioned particularly as to the condition of the house, and the only defects he pointed out were that the house needed paint badly and that it needed papering; that there was some deterioration of the woodwork outside, especially that of the porch floors “around the gables”. While he said that the roof, both over the main part of the house and over the porch, was comparatively new and in good condition, his impression was that the roofing used was of cheap quality. ■ However, the testimony of the man who put a portion of the roof on and the testimony of Sie Green show that a portion of the roof was put on about two years ago and the other portion about five years ago, and that the best quality of material was used. Sie Green testified that, when the roof was put on, he was given a guarantee that it would last 20 years. The contractor who put on a portion of the roof said it was built-up composition roofing and would last for 20 years.
 

 Mr. Dunn, the other expert called by the Housing Authority, gave testimony similar to that of Mr. Teat as to the size of the house, its structure, and its state of repair. Their testimony as a whole shows that there are practically no defects whatever about the residence except some deterioration on the outside due to lack of paint. In fact, they stated, as did other witnesses, that there was no paint left on the outside of the house at this time, and that the house was badly in need of papering. The testimony of these witnesses and that of those who testified for the defend
 
 *472
 
 ants clearly show that the foundation and walls of the house are in perfect condition with the exception of the defects mentioned. The house, according to the testimony, was built about 50 years ago. But the lumber used was of the best quality and is perfectly sound. One of the witnesses testified that the lumber used was of a much better quality than can be had at the present time.
 

 There are two photographs in the record. These show that the roof, the weatherboarding, the guttering, the railings and grill-work around the porch, the downspouts, the cornices, and the gables are in perfect condition. The photographs show that the residence is of old-style architecture but presents a handsome appearance. They show also that there are trees and shrubs on the lot. The photographs do not show the condition of the painting, which admittedly is completely worn away, but the house, as shown by the photographs, is in perfect condition. The witnesses all said that it is in good condition with the exception already noted.
 

 While the testimony shows that the property is in a section of the city now inhabited exclusively by Negroes, the house was built and originally used as a residence by white people. Later on, as the city grew, the white population shifted to other sections of the city, and Negroes moved into the district where this property is situated. All the testimony shows that the house was well built, of the best material, and was equipped with all conveniences, such as lights, gas, water, bathroom, etc. The testimony shows that it would cost approximately $7,000 or $8,000 to replace the house, and that defendants bought it on contract in 1925 for $6,200 and finished paying for it in 1935, when their deed was executed. A new roof was placed on the main portion of the house in 1936, and the porches were recovered about a year and a half or two years prior to the date on which this suit, was filed. It is a large house with three bedrooms, a large living-room (called a parlor when the house was built), a hallway, kitchen, and bath downstairs, and three bedrooms and a storage room upstairs. According to the testimony, the house would last for many more years without repairs. Mr. Teat, one of the plaintiff’s witnesses, said that he went into the house on a cold day and found it comfortable.
 

 Defendants’ witness Roos testified that he owned approximately 100 Negro houses and that he had charge of 68 more; that he had carefully inspected this house and the lots, and that in his opinion the house now had a value of $3,500, and that the lots were worth $1,600. Defendants’ other witnesses, McClurg and Dupree, both building contractors, said it would cost between $7,000 and $8,000 to replace the house, but that they did not feel qualified to estimate the depreciation and. therefore did not estimate the present value of the house itself, although they stated, as did the witness Roos, that the lots were worth $1,500 or $1,600.
 

 Neither side offered any testimony to show the rental value of the property. As to market value, the testimony shows that there is no demand for such property, for
 
 *474
 
 the reason that the only people who live in that vicinity are Negroes, who are not financially able to own and keep up residences of this character.
 

 The general rule is that the measure of compensation to be awarded the owner in expropriation proceedings is the price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy — in other words, the market value of the property. There are exceptions to this rule. In cases where there is no market value for a residence sought to be expropriated, the intrinsic value, or its value to the owner, must be taken into consideration; otherwise he might be deprived of his property without just and reasonable compensation. The compensation to which the owner is entitled is the full and perfect equivalent of the property taken — in other words, the loss caused to him by the taking. “This means substantially that the owner shall be put in as good position pecuniarily as he would have been in if his property had not been taken”. 18 Am.Jur., § 240, p. 874. This is the rule established long ago and consistently adhered to by the Supreme Court of the United States.
 

 Taking into consideration all the testimony, we think an award of $4,500 would be adequate but not excessive.
 

 Defendants claimed damages of $500 for the loss of music pupils. Counsel for defendants admitted that this item is purely speculative and not susceptible of proof. Defendants also claimed $250 for inconvenience. In the case of McMahon and Perrin v. St. Louis, Ark. & Tex. R. Co., 41 La.Ann. 827, 6 So. 640, it was held that mere consequential injuries to owners of property, arising from discomfort, disturbance, injury to business, and the like, are sacrifices which society has the right to ask for the public good, and are not compensable. See, also, Louisiana Highway Commission v. Boudreaux, 19 La.App. 98, 139 So. 521. They also claimed $50 for the cost of moving. But they offered no satisfactory evidence to show what it would cost them to move.
 

 For the reasons assigned, the verdict and judgment appealed from are amended by increasing the amount awarded to defendants from $3,650 to $4,500, and, as thus amended, they are affirmed; all costs to be paid by the Housing Authority.
 

 FOURNET, J., concurs in the conclusion that the amount awarded by the jury should be increased, but does not agree that the $4,500 awarded in the majority opinion is adequate, being of the opinion that under the evidence in the record the amount should be increased to $5,100.