STATE of Louisiana, Through the Department of Highways,

v.

Norman E. SAULS.

No. 43321.

Jan. 6, 1958.

W. Crosby Pegues, Jr., D. Ross Banister, Baton Rouge, Howard W. Lenfant, Special Counsel, New Orleans, for plaintiff and appellant.

Gordon B. Hyde, New Orleans, for Norman E. Sauls, defendant and appellee.

FOURNET, Chief Justice.

The State of Louisiana, through the Department of Highways, having instituted proceedings to expropriate certain property belonging to the defendant, Norman E. Sauls, in connection with its project for construction of a certain elevated roadway and appurtenances,[1] and having deposited in the registry of Court the sum of $84,000, the estimated value of the property, a judgment of expropriation was entered, followed by trial on the merits where the sole question presented was the value of the property taken; and from a judgment fixing the just compensation at $95,000, and ordering the plaintiff to deposit in the registry of Court the deficiency of $11,000, with 5% interest from date title vested in plaintiff (May 21, 1956) to date of payment of the deficiency, the plaintiff has appealed, seeking a reduction in the award to the sum initially deposited. The defendant answered the appeal, asking that the award for the real estate actually taken be increased to $105,000, and that his claim for damages due to "reduction or diminution in market value" of certain movable property, in amount of some $15,000, be entertained and that phase of the matter remanded to the district court for evidence and consideration.[2]

The property expropriated lies in Square No. 184 of the City of New Orleans,

---

1. This roadway forms part of the Pontchartrain Expressway, a link in the State highway system, and is to serve as an approach to the Mississippi River Toll Bridge at New Orleans now nearing completion.

2. The evidence, which the district judge ruled was not admissible, would have been offered to prove damages for reduction in value of (a) merchandise in a grocery store operated by defendant, said to have diminished in value by an estimated $8,081.66 upon liquidation of that business; (b) trade fixtures, said to have had a depreciated value of some $9,700 (and a similar market value while

bounded by Clio Street, St. Charles Avenue, Calliope and Prytania Streets, and formed the corner of Prytania and Calliope Streets, with a frontage on Prytania of 87'6" by a depth on Calliope, between parallel lines, of 120'3"—an over-all area of 10,522.5 square feet; the zoning was "F" Commercial, and the property enjoyed the use of a common alley fifteen feet wide which extended across the rear. The improvements, covering practically the whole land area, were four buildings of three different types: (a) two old frame dwellings termed "two-story singles," one occupying the corner (58' on Prytania by 65' on Calliope) and facing Prytania while the other occupied the rear of that lot (55' on Calliope by 58' depth) and faced Calliope, these buildings containing 9 and 8 rooms, respectively, each with baths upstairs and down, 11 of the rooms being furnished and rented as lodgings or for light housekeeping;[3] (b) a one-story frame structure covering the unoccupied corner tip of land up to the sidewalk on both streets, 31' in width and extending down Calliope some 65', in which defendant operated a neighborhood grocery store, this building having been added in 1935 and so constructed that it appeared to be an outgrowth from the lower floor corner of the Prytania Street house;[4] and (c) a one-story brick and steel building designed for use as a store and warehouse, but not entirely finished, occupying the remainder of the quadrangle (i. e., 29' frontage on Prytania by a depth, to the alley, of 120 feet), constructed in 1953 by the defendant at a cost of $20,460, with plate glass windows beside the front door, a skylight, a large roll-down rear door giving on the alley, and with the rear 80 feet of floor paved; however, the front 40 feet of floor space were simply dirt, having never been finished, and the building was without interior partitions.[5] This warehouse

attached), this amount having been "substantially reduced" when they were severed from the operating business and also reduced due to cost of removing and installing them elsewhere; and (c) furniture in rental units, said to have had replacement value of $2,200, but which "brought only a few hundred dollars" when liquidated as used furniture.

3. The defendant explained that he and his wife occupied the lower floor (four rooms) of the house on Calliope Street, which left the upper four rooms of that building for rental, and from these he received, for each room, $5 per week. His mother occupied two rooms on the lower floor of the Prytania Street house, which left seven rooms there for rental, at $6, $7 and $9 per week, a revenue from that building of $59 each week. He furnished electricity, gas, water, a desser, washstand and bed, gas plate and, in some instances, an ice box. He stated that he had always kept his rooms rented without difficulty, and that one of his tenants had been with him more than twenty years.

4. In response to a query concerning his average gross monthly sale, the defendant replied that "in a number of cases" he had had "between $10,000 and $11,-000."

5. It appears that the defendant had planned to secure another building permit

bore municipal number 1109 Prytania, next to which was 1105 Prytania, the residence; 1101 Prytania, the grocery store, and around the corner, 1514 Calliope, the other dwelling. Important from a commercial standpoint was the fact that this property was easily accessible, situated on the right side of Prytania, a two-way street; also that it was a readily identified and easily remembered corner, since Prytania ended at that point with only a tip of neutral ground in front of the subject property, which faced an unencumbered space of considerable width looking across Camp Street at the convergence with Prytania.

The experts who testified in this case, two for the plaintiff and two for the defendant, are men thoroughly familiar with property values in New Orleans and are experienced appraisers in the local market; yet the approach of each was somewhat different, and after conscientious and painstaking explanations of their respective processes of calculation the plaintiff's appraisers maintained that $84,000 was the true valuation at the time of taking— which, incidentally, amounted to a value of about $8 per square foot for the land and improvements—while the defendant's appraisers arrived at separate values of $105,-472 and $104,283—roughly, $10 per square foot for the 10,522.5 square feet in the parcel. The trial judge's award of $95,000 —reflecting, as he observed, a round figure valuation of $9 per square foot—was reached after an inspection of the property, the neighborhood and the vicinity, and upon considering its value as an assembly, its corner location, its zoning status, its best and most profitable use, and the fact that the square was bounded on the other end by St. Charles Avenue. The plaintiff-appellant contends, however, that the lower court's figure is merely an approximate average of all appraisals, and that there was no justification from the evidence for an increase to a higher figure than $84,000 because the opinions of the defendant's experts were not based on sound appraisal practice nor on any firm foundation. The defendant, on the other hand, takes the position that the comparable sales used by plaintiff's experts were sales under threat of expropriation and had little probative value; and that they erred in refusing to consider land values established by other private sales in the vicinity (termed "monopoly" sales by plaintiff's experts) in the erroneous belief that those were not voluntary sales and therefore not comparable; and that the correctness of the higher estimates reached by his own ex-

for completion of the front interior when he found a tenant for the store, conforming to the tenant's needs, but upon application was denied the permit by the City because a doubt had developed as

to whether defendant's property would be expropriated, as a result of a slight shift in the plan for taking land necessary for the bridge approach.

perts was proved in the light of these so-called monopoly sales.

A perusal of the record shows that plaintiff's expert Eugene Aschaffenburg thought that the property would sell more advantageously as two pieces, the warehouse as one parcel and the remainder or "corner" property as the other; and observing that the two frame dwellings, more than 60 years old, had been turned to the most productive use possible and it was therefore difficult to find comparable properties, he concluded that the income method of appraisal was best for the "corner" property. He estimated the rental value of the 17 rooms in the two dwellings, unfurnished, at $12.50 per room per month (based on similar rents in the neighborhood), or $2,550 per year, and the rental value of the store (2,685½ sq. ft. at $1.50 per sq. ft., based on comparable rentals) at $4,028 per year, or a total of $6,578, which, capitalized at 12%—thought to be proper on this type of property where the upkeep was high—arrived at $54,817, or, in round figures, $55,000, the fair market value he placed on the "corner." The warehouse, containing 3,630 sq. ft., he estimated would rent (on the basis of comparable rents) for 80¢ per sq. ft. or $2,904, which he capitalized at 10%—since the building was comparatively new—resulting in a round figure of $29,000; this, added to the $55,000 for the "corner" property gave $84,000, his estimate of the property in its entirety and which, he noted, "figured $8 per square foot." As a check against his estimate of the value of the warehouse property (since the building had never produced revenue) the witness used the cost approach, by which he showed the depreciated value of the building to be $18,810, the land alone to have a value of $3 per square foot, or $10,890, giving a total of $29,700. The witness placed emphasis on his statement that this method of appraising property is merely to serve the appraiser as a check on his valuation, but is not necessarily the value of the property. Mr. Aschaffenburg then reviewed numerous sales in the vicinity, mentioned one across the street which he considered especially comparable, and observed that his estimate was higher, when figured on a square foot basis, than any of the other comparable sales mentioned; however, he disregarded certain private sales (where the prices paid were considerably higher), explaining that they were made under abnormal circumstances and did not meet the fair market value test. The other witness for the plaintiff, E. Holland Johnson, stated that he also had relied on the income and the market approaches, and had even tried, where applicable, a third approach, known as the summation method, i. e., replacement less depreciation. His testimony was largely concerned with comparison of market values in the vicinity.

The experts who testified for the defendant are B. Van Pelt Biggar and Cliff Probst. The former, in reaching his estimate of $105,472, calculated that the land

had a value of $5 per square foot—in view of its corner location, use of a "through" alley giving a rear entrance to warehouse, on two-way street, with open location, etc.; or a total value, for land, of $52,611. The improvements were figured at replacement cost less depreciation,[6] on a square foot of floor basis; i. e., the total cost of the grocery store, when depreciated 50%, gave a value for that building of $12,017; the cost of the two floors of the Prytania Street house, when depreciated 65%, left a value for that house of $10,976; on similar calculations, the Calliope Street house, depreciated 60%, had a net value of $9,408; and for the warehouse, a value was allowed of $20,460, its cost. On this basis, the value of all improvements totaled $52,861. By another approach, the income basis, the witness stated that the grocery store should rent for $3,600 per year; the warehouse should bring $3,000 per year gross rental (80¢ or 90¢ a square foot); the nine rooms in the Prytania Street house should rent for $6 a week, which included furnishing utilities, water, and furniture, producing a gross income of $2,808 per annum; and the eight rooms in the Calliope Street house, at the same rental, should produce $2,496

per annum; these gave a total yearly rental of $11,904 which, when reduced by total estimated expenses of $3,647 per annum (itemized as taxes, insurance, maintenance, utilities, depreciation or replacement cost of furniture, allowance for vacancies), left a net income of approximately $8,300, which figure, capitalized at 8%, gave a total value, according to his calculations, of $103,712, and was used by the witness as a cross check against his first method.[7] As affecting only 1109 Prytania (where the warehouse stood), which had been purchased by the defendant in 1938 for $4,650, an additional computation was made; based on the Consumer's Index showing an increased value from 1938 to 1956 of approximately 300%, that parcel measuring 3,600 sq. ft. was presently worth $14,940, or $4.15 per sq. ft., to which should be added the plottage and corner influence value, bringing the figure to $4.98 per square foot. The witness also discussed private sales he considered comparable, in the adjoining block (bounded by Howard Avenue, Camp, Calliope and St. Charles Avenue), pointing out that these brought $7.96, $8.55 and up to $15.44 per square foot. The appraisal of

6. This witness did not take into consideration any depreciation on the buildings for the stated reason that the amount allowable was up to the Federal and State governments, but included a figure of $992 for maintenance of the property, and "heavy expenses."

7. Mr. Biggar expressed the view that a better selling price could be obtained by a sale of the whole to one person; that the land alone per square foot would be much more valuable when put to its highest and best use—in his opinion a multi-storied office building, in which case the land could command a price of $11 or $12 a square foot.

Cliff Probst, the other expert for the defendant, amounted to $104,283; he calculated the 10,522.5 sq. ft., considered in the light of the various advantageous factors mentioned above, to have a value of $5, or $52,610, to which he added half the dimension of the fifteen-foot alley, or 656 sq. ft., at the same figure, amounting to $3,280— a total for the land of $55,890. The improvements, figured on a replacement cost per square foot basis less depreciation for each building, resulted in figures as follows: Calliope Street house, net of $12,382; corner store plus a connecting covered passageway to the Calliope Street house, a net of $13,230; the Prytania Street house, a net of $16,538; and the warehouse (considering that depreciation would have been offset by increase in prices of materials since it was built in 1953), the cost of $20,-460. The addition of these net amounts plus the land value resulted in a total of $118,500, from which the witness deducted $14,217, giving his valuation of $104,283; he explained that the amount subtracted resulted from a recalculation of the value of the land occupied by the residential units (4,062 sq. ft.) at 3.50 per square foot instead of $5; that having taken into consideration the residential rents and improvements, it followed that the lots on which these buildings stood should have the price of residential lots. Mr. Probst made

no estimate on the income method but did use the market value approach to check the summation method, for land only, considering in this connection the sales made in adjoining blocks down Camp Street to Pan Am, the National American Bank, and others; but took no property into consideration which had been sold to the bridge authority because he found none that was comparable.

A restatement of the rules with respect to a determination of fair market value in expropriation proceedings would seem unnecessary; the difficulty arises from their application. As has often been said by this Court, the best guide is evidence of sales of similar or comparable properties in the vicinity. We have also stated that sales to a condemning authority in advance of expropriation are not controlling, though they may be considered; that rental income derived by the owner, and value of business conducted upon expropriated premises, while not the sole measure of compensation, may be considered along with other factors in arriving at the market value; that various considerations, such as location, assembly or plottage value, corner influence, and best use, are of great importance in fixing market value; and that it is unrealistic to discard numerous sales in the vicinity which commanded higher prices, terming them "monopoly sales"

which did not reflect a price between a willing buyer and a willing seller.[8]

 We have studied and analyzed all of the testimony of the experts, and have examined numerous photographs in the record showing the expropriated property as well as other parcels considered as comparable sales. It is evident that because of the type of buildings on the subject property and the use to which they were put, it was most difficult to find an exact measure or yardstick; nor are we prepared to say in this case that one method of appraisal should be adopted over others, for while the estimates of these qualified and experienced experts appear to have been conscientiously formed, there were weak points in the analyses on both sides. On the other hand the trial judge, as revealed by his comments and checks on the various calculations throughout the trial, not only carefully followed the witnesses through long and tedious testimony, but, in addition, personally inspected the property, the neighborhood, and the vicinity as a whole; and, keeping in mind the various factors which affect value, concluded that $95,000 was the fair market value. In view of the

showing made, we would not feel warranted in saying that the award was either excessive or insufficient.

· There is no merit in defendant's contention that his remaining property, i. e., his grocery merchandise, trade fixtures, and furnishings of the rental units, were "damaged" due to the taking, the measure of such damage being the diminution in their value upon resale; and that the trial judge erred in excluding evidence to show the loss suffered. It is well settled that mere consequential injuries to the owners arising from disturbance or injury to business are *damna absque injuria*.[9] Yet it is said that defendant, because he was unable "to purchase other property of like value or location in the neighborhood," was "forced to liquidate his grocery merchandise, trade fixtures, and apartment furnishings," and that such liquidation was a "result of the expropriation of his properties." The novel claim that a person whose property is expropriated should be indemnified for being unable to reestablish his business in property of like value in the same neighborhood finds no support in law or reason. The liquidation was defendant's

8. Mississippi River Bridge Authority v. Simon, 232 La. 668, 95 So.2d 144, and cases there cited; other pertinent authorities for the rules stated above are Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40; Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541; Housing Authority of New Orleans v. Brinkmann, 224 La.

262, 69 So.2d 37; City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So. 2d 445; Housing Authority of New Orleans v. Persson, 203 La. 255, 13 So.2d 853; Housing Authority of Shreveport v. Green, 200 La. 463, 8 So.2d 295.

9. Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40, and authorities therein cited.

own decision, and any loss suffered as a result thereof is not compensable.

For the reasons assigned, the judgment appealed from is affirmed.