136 So.2d 35

**STATE of Louisiana, THROUGH the DEPARTMENT OF HIGHWAYS,**

v.

**Ben LEVY, Jr.**

No. 45621.

Dec. 11, 1961.

Rehearing Denied Jan. 15, 1962.

D. Ross Banister, Glenn S. Darsey, Brunswig Sholars, Ben C. Norgress, Chester E. Martin, Baton Rouge, for plaintiff-applicant.

Blanchard, Goldstein, Walker & O'Quin, Shreveport, for respondent.

HAMLIN, Justice.

This matter involves the expropriation of a lease affecting a certain described piece of property located in the City of Shreveport, Louisiana. In the exercise of our supervisory control (Art. VII, Sec. 11, La.Const. 1921), we granted certiorari to review a judgment of the Court of Appeal, Second Circuit (129 So.2d 516, 517), which awarded defendant $46,500.00 as the value of its lease and reversed and set aside a judgment of the trial court holding that the market value of the lease expropriated was No and 00/100 Dollars and casting defendants in costs.

The facts leading up to the instant controversy are correctly recited by the Court of Appeal as follows:

"* * * many years ago a brick building designed for the use and operation of a laundry and dry cleaning business was erected at the corner of Howell Street and Line Avenue in the City of Shreveport. The business owned and operated on the said premises by Shreveport Laundries, Inc., was liquidated in 1955 and in the accomplishment of said liquidation the land and improvements thereupon were sold to one David Goldman, acting for himself and associates, for the sum of $90,000.00, and the laundry business, together with all equipment and appurtenances, was sold to Ben Levy, Sr., for a consideration of $65,000.00. Contemporaneously with these conveyances

Goldman leased the building to Levy, Sr., for a term beginning September 9, 1956 and ending March 8, 1958, at a rental of $750.00 per month, together with the assumption by the lessee of additional obligations therein specified. Under date of November 7, 1956, another lease was executed by Goldman as lessor and Ben Levy, Jr., as lessee, in which the term was fixed as commencing September 9, 1956, and terminating March 8, 1963, in consideration of a monthly rental of $750.00 through March 8, 1958, and $1,000.00 thereafter for the remainder of the term of said lease. An amendment to the last described instrument was executed between the said parties under date of September 1, 1957, extending the term thereof to March 8, 1968, and providing for an increase of $100.00 per month in the rental provided in the original lease subsequent to March 8, 1963. The lease, as amended, was conveyed by Ben Levy, Jr., to New Way Laundry & Dry Cleaning Corporation by instrument dated October 13, 1958. Under threat of expropriation Goldman and his associates, as owners of the land and improvements, sold and conveyed the same to plaintiff by instrument dated February 6, 1959, for a cash consideration of $152,000.00, it being specifically understood and agreed that the said sale and convey-

ance was made subject to the lease dated November 7, 1956 and amended September 14, 1957. (It is evident that the date of amendment to the lease is in error and should have been set forth as September 1, 1957).

"New Way Laundry & Dry Cleaning Corporation, under mutual agreements with plaintiff, did not vacate the leased premises, which are the subject matter of this litigation, until on or about the month of June, 1960, at which time the unexpired term of the original lease as amended would have been approximately ninety-three months."

On March 2, 1959, plaintiff brought suit for the expropriation of the lease, alleging that defendant's leasehold had no market value other than the nominal sum of $10.00, which it had deposited in the registry of court; it stated that the expropriation was necessary for the construction of State Project No. 451–01–07, Federal Aid Project No. 1–20–1(17) 17, Shreveport Expressway, State Route Louisiana I–20, Federal Aid Interstate Route No. 4.

In answer to plaintiff's petition, the defendants (New Way Laundry & Dry Cleaning Corporation, assignee of the lease by assignment from its president, Ben Levy, Jr., was added as a party defendant) prayed for $450,000.00, plus $25,000.00 attorney's fees. They averred that the value of the

unexpired term of the lease was worth no less than $250,000.00, and that the value of the machinery in place and connected to the leased building amounted to $200,-000.00. New Way Laundry & Dry Cleaning Corporation (real party defendant and hereinafter referred to as defendant) filed an amended answer, averring that "to permit petitioner herein to expropriate the aforesaid lease upon payment to respondent of the nominal sum of $10.00 constitutes a taking of petitioner's property without the payment of the fair value thereof and will cause respondent to suffer heavy damages by reason of being required to locate its plants in some other building if one can be found; and to take respondent's lease and the fixtures which go with the lease without payment of the substantial value thereof would directly contravene the provisions of the Fourteenth Amendment to the Constitution of the United States of America, of Article 1, Par. 2, and Article 4, Par. 15, of the Constitution of the State of Louisiana, and of Articles 467, 468 and 497 of the Revised Civil Code of Louisiana."

In rejecting defendant's demands, the trial court found that the instant lease did not have a value in excess of what defendant was previously paying for the lease; that plaintiff had not expropriated defendant's business; that the equipment located in the building did not belong to plaintiff; [1]

1. The trial judge stated: "Assuming that the equipment in place in the building was

worth $228,000, and $30,000 worth was removed, this would leave $198,000 worth

and that the disruption of defendant's business and the cost of removal were consequential damages for which there was no recovery.

On appeal, the Court of Appeal found that the facts established on trial did not prove that the ownership of the machinery, equipment, etc., for which New Way Laundry & Dry Cleaning Corporation was claiming an allowance of damages to the extent of $200,000.00, was vested in the claimant; [2] it stated that it could pronounce no definitive judgment with reference thereto.

The Court of Appeal further stated that in a strictly technical sense the defendant had failed to prove any value of the leasehold interest, but being influenced by the equities of the case, it would give a more detailed consideration to a basis upon which the value of the lease could be determined.

A review of the evidence (witnesses for the defendant testified that the land had a value of $90,000.00 to $100,000.00, and that the replacement cost of the building would be $238,000.00) convinced the Court of Appeal that it could use a hypothetical question which would indicate the total value of land and improvements at $328,000.00, whereas, the land and improvements had actually been purchased by plaintiff from the owner thereof for a total consideration of $152,000.00. A witness for the defendant testified that the rental value of the property should be fixed at $39,000.00 to $40,000.00 per year; the Court of Appeal employed $40,000.00 as a hypothetical estimate of rental. The Court then adopted a proportionate formula, which it stated as follows:

"The cost of land and improvements represented by the hypothetical question is to the actual consideration as the hypothetical estimate of rental is to the proportionate rental upon the actual consideration involved."

of machinery in place in the building. The evidence shows that all this equipment was dismantled and piled up in the building by defendant, and the evidence further shows that a large quantity, if not all of said property that was left in the building, was stolen.

"Defendant furnished to plaintiff a list of said property, which is shown by document marked P–8 and filed in evidence. No contention is made by defendant that plaintiff had anything to do with the disappearance of said equipment. In fact, plaintiff notified defendant and its banker that the building had been entered, and to look after their property. Of course, if plaintiff had expropriated defendant's business, the property belonged to plaintiff and not to defendant."

2. "Our examination of the record serves to sustain this conclusion, and, according to the testimony of Mr. Levy, it appears that his father, to whom the machinery and equipment was sold under the liquidation proceedings, never divested himself of said ownership, in which event his title would have passed to his succession. It is therefore impossible to follow the title to this property, that is, the machinery, equipment, etc., to the present legal ownerships, and, accordingly, we think no definitive judgment can be pronounced with reference thereto." [129 So.2d 518.]

The Court of Appeal substituted the above figures, in thousands of dollars and derived the following algebraic formula: $328:152::40:X$.[3] Application of the above formula established the value of X as being approximately $18,000.00 per year, or, $1,500.00 per month. From this $1,500.00 per month, the Court subtracted the $1,000.00 per month which defendant was paying and found that the actual loss to lessee in the value of the lease caused by the expropriation proceeding amounted to $500.00 per month for ninety-three months, the unexpired term of the lease, or, a total of $46,500.00.

Relator, State of Louisiana, through the Department of Highways, assigns many errors to the judgment of the Court of Appeal; they may be summed up in toto as follows: "As to the value of the lease, defendant introduced no evidence of the value of the subject lease. The Court of Appeal attempted to hypothetically construct a new building and fix a rental upon it, as the basis of an award, in a manner that has no legal or moral foundation, contrary to the law of the State of Louisiana."[4]

Respondent (who did not apply to this Court for Certiorari), in its second brief filed in this Court on November 3, 1961, prays that the judgment of the Court of Appeal be affirmed.

Posed for our determination, therefore, is one issue, namely, "the Lessee's Advantage." Neither plaintiff relator nor defendant respondent has objected to the rulings of the District Court and the Court of Appeal, supra, with respect to the items of equipment for which the defendant made a claim in the trial court.

Initially, we think it appropriate to cite the pertinent law and jurisprudence relevant to the issue involved.

■ "The right of a lessee is not a real right, i. e. a jus in re. In other words, the lessee does not hold one of the elements of property in the thing. His right is a jus ad rem, a right upon the thing." In Matter of Morgan R. R.

---

3. We have checked the correctness of the algebraic solution arrived at by the Court of Appeal, and we now desire to set forth the arithmetical solution:

$328,000) $40,000.000 (.121%
               32 800 0
           ——————
               7 200 00
               6 560 00
           ——————
                 640 000
                 328 000
           ——————

Proof:—
          $152,000
              .121%
          ——————
           152 000
          3040  00
         15200 0
         ——————
         $18,392.000
Approximately $18,000.00, as found by the Court of Appeal.

4. Relator's brief, pg. 40.

and S. S. Co., 32 La.Ann. 371. See, State v. Ferris, 227 La. 13, 78 So.2d 493.

"If, during the lease, the thing be totally destroyed * * * or it be taken for a purpose of public utility, the lease is at an end. If it be only destroyed in part, the lessee may either demand a diminution of the price, or a revocation of the lease. In neither case has he any claim of damages." LSA–C.C. Art. 2697.

■ "The right of expropriation being a legal one, its exercise does not give rise to any other than actual damages; consequently, damages are not to be considered. The law fixes these actual damages where the whole of a thing or right is taken at the fair value of that thing or right. The fact that the owner or lessee might build a store, or a factory, or warehouse on the lot, and derive large profits from that business, would not make those contemplated profits a proper element in fixing its present value. So the fact that the lessees, by keeping a coal-yard on the lot, and having free access to the wharf (which they have not, by reason of the privileges accorded to this company by the city), might realize large profits from that business, would not justify us in taking the amount of these prospective and problematical profits as the value of the lease.

■ "The true question is, what advance could the lessees get for the lease over the price or rent they are to pay? In other words, if the lease was put on the market for sale, what sum in excess of sixty dollars per month could be obtained for it, the improvements put thereon by the present lessees being excluded from the calculation? These improvements belong to the lessees, the lessor or owner having the right of electing to keep them at an estimation. . The owner and not the lessee has this right of election, and he cannot be compelled to take them, it being by law a matter of option on his part. The commissioners and the court erred, therefore, in charging unconditionally these improvements as part of the amount to be paid by the company. C.C. 2726, 508." In Matter of Morgan R. R. and S. S. Co., 32 La.Ann. 371, 376.

■ "In expropriation suits the measure of compensation to be awarded for the property taken is the market value of that property—that is, the price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy. Most important in determining this market value are sales of similar or comparable properties in the neighborhood. If evidence of similar sales is not available, the value of the land expro-

priated must be determined by other means, generally the testimony of experts. The rule here is that the testimony of each expert should be given effect if that testimony appears to be well reasoned and sincere. However, if the expert testimony impresses the court unfavorably, it will be disregarded. Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541; Domino v. Domino, 233 La. 1014, 99 So.2d 328; State v. Grand Consistory, 237 La. 1005, 112 So.2d 692." State of Louisiana Through Department of Highways v. Hub Realty Company, Inc., 239 La. 154, 163, 118 So.2d 364, 368. See, State of Louisiana Through Department of Highways v. Havard, 239 La. 133, 118 So.2d 131; Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491; Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40.

■ " * * * Mere consequential injuries to the owners, arising from discomfort, disturbance, injury to business, and the like, remain, as they were before, damna absque injuria,—particular sacrifices which society has the right to inflict for the public good. Such is the view taken by the supreme court of the United States * * *." McMahon v. St. Louis, A. & T. R. Co., 41 La.Ann. 827, 6 So. 640, 641. See, Housing Authority of Shreveport v.

Green, 200 La. 463, 8 So.2d 295; Gulf States Utilities Co. v. Callahan, La. App., 65 So.2d 608; Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40; East Baton Rouge Parish Council v. Koller, La.App., 94 So.2d 505; State v. Sauls, 234 La. 241, 99 So.2d 97.

■ " * * * In an expropriation suit the market value of the property and the damages growing out of the expropriation must be determined at the date of the institution of the expropriation suit, and not at some indeterminate time in the future. Louisiana Highway Commission v. De Bouchel, 174 La. 968, 142 So. 142; State v. Landry, 219 La. 721, 53 So.2d 908. * * *." Louisiana Power & Light Company v. Simmons, 229 La. 165, 85 So.2d 251, 253. See, Gravity Drainage District No. 1 of Rapides Parish v. Key, 234 La. 201, 99 So.2d 82; Koerber v. City of New Orleans, 228 La. 903, 84 So.2d 454; LSA–R.S. 48:453.

Mr. Ben Levy, Jr., President of the New Way Laundry & Dry Cleaning Corporation, testified that he would accept $680,000.00 for his business, which amount included good will, the trucks, the lease, and all of the equipment. He stated that prior to the expropriation his business showed a profit of $6,000.00 per month; that in addition to the New Way Laundry & Dry

Cleaning Corporation, his company operated the Louisiana Industrial Towel & Uniform Service, the Southwestern Towel & Uniform Service, and the Tidy Diaper Service. Mr. Levy affirmatively stated that the old building was very satisfactory and suitable for carrying on his enterprises. He testified that after the expropriation his business was moved to two locations—one in Shreveport and one in Bossier; that the building expropriated consisted of some 30,000 square feet, whereas, the two locations, supra, consisted of less than 20,000 square feet. He further stated that his company gave up 20% of its business after the move. Mr. Levy replied, "Yes, sir," to the following question:

"From your experience through these years, would you agree with me that it would be proper to state that there is no general market for a lease on a laundry in the Caddo Parish area? That is, that it is a specialized business, and the general public would not be interested in the purchase of such a lease or a business as you have, it being restricted to people experienced in the business? Is that correct?"

Mr. Carl Rosenblath (engaged in the real estate brokerage business) testified that $100,000.00 was the fair value of the lots upon which the building occupied by defendant was located. Mr. J. W. Matthey (New Orleans Manager and Branch Manager of the American Laundry Machinery

Company, Cincinnati, Ohio) placed a value of approximately $624,000.00 upon defendant's business. Mr. George E. Tallman (associated with Werner Company, Inc., general building contracting) testified that the building occupied by defendant could be replaced for $238,500.00. Mr. J. Pollard Sealy, Jr. (engaged in the real estate business) testified that based on a lot value of between $90,000.00 and $100,000.00 and a building value of $238,000.00, he would place a rental value on the building occupied by defendant at between $39,000.00 and $40,000.00 per year. Mr. Paul O. Rottmann (senior partner of Rottmann, Harriss & Jambor, consulting mechanical and electrical engineers) testified that he had informed Mr. Levy that the cost of replacement of the distribution systems and condensers and electric lighting would be $137,000.00 in place as depreciated. Mr. Julian Alexander (engaged in the laundry and dry cleaning business in Little Rock, Arkansas) testified that defendant's business was worth approximately $450,000.00 to $500,000.00. Mr. Frank J. Zuzak (engaged in the real estate business) testified that, assuming in round figures a value of three hundred thousand dollars for the building and the ground occupied by defendant, he would estimate that a ten year lease should produce an annual rental of between thirty-one thousand and thirty-four thousand dollars annually. These witnesses all testified on behalf of the defendant.

Mr. Lawrence L. May (a realtor, a dealer and broker in mortgage loans, and a professional real estate appraiser), who was called as a witness on behalf of the plaintiff, testified that on a $90,000.00 investment such as was made by Mr. Goldman, the required annual rental should be $8,626.00. He testified that the annual rental at the time of expropriation should have been approximately $12,764.00, the averaged actual rental being $12,600.00. He stated that the difference of $164.00 was of little consequence because of a building of the size involved; it actually meant on a square foot basis only six-tenths (.006) of a cent per square foot. He said, "The contract rent was fifty and four-tenths cent (.504) and the economic rent would have been fifty-one cents (.51)."

Mr. May then gave the following pertinent testimony:

"Q. Let us take all these figures and facts and set them aside, and arrive at the conclusion that you reached as the result of them.

"First, I would like for you to state what, in your opinion, does the expression 'lease advantage' mean? A. Well, 'lease advantage' means that a property would bring, on the market, more rent than the tenant is paying.

"Q. In other words, has he—either by luck, or skill, or any other reason—made a fortunate lease in that he is renting premises for less than they would bring on the open market? Is that correct? A. No, it seems to me that he is paying just about what the market calls for.

\* \* \* \* \* \*

"Q. In the case before the Court now, as a result of your investigation, your computations, your different methods of approach, what was your decision, insofar as a leasehold advantage in favor of anyone, in this case? A. It was my opinion that the lease was worth nothing.

"Q. More than they were paying? There was no 'lease advantage'? A. There was no 'lease advantage.' The lease was worth nothing to anyone else."

Mr. May estimated the value of the property from the replacement cost—that is, the land and the building—and arrived at a value of $331,797.00. He stated that he knew of no vacant building in Shreveport that would be suitable for the operation of the plants that were in defendant's laundry.

Mr. O. L. Jordan (a realtor), who was called as a witness on behalf of the plaintiff, testified that the land and improvements had a value of $152,000.00, as of the date of expropriation. On a breakdown, he said that the land was valued at $57,-850.00, and the improvements, $94,150.00.

He pertinently stated that, "The value of the subject land is fixed, due to the fact that the entire tract of land was covered with a building. The lots that are sold farther out on Line Avenue are available for modern construction and off-street parking; buildings can be planned to fit on the land. The subject is burdened with a building that covers the site. So, really, you could not expect to separate this land value and place the present market value that someone is paying for a parcel to build a doctors' clinic, or something of that nature, on; because, actually, its earning capacity is limited, due to the fact that the land is improved with a building that covers the site."

With respect to net return, Mr. Jordan stated:

"To illustrate to the Court the net return that the owner was getting, based on that investment, based on the valuation arrived at by the income approach, and then based on the appraised valuation as of the date of the appraisal. That gives you three breakdowns there. It shows the net return that the owner was getting on his actual ninety thousand dollars ($90,000.00) investment; it shows what a prudent investor would get, if he bought it, based on the income approach of one thousand dollars ($1,000.00) a month rental for the term of this lease; and it shows the net that the owner was

getting in each step of the lease, as it accelerated from seven hundred and fifty dollars ($750.00) a month, right on up to eleven hundred dollars ($1,-100.00) a month.

"You will note, in the right-hand column, that the current rental, as of the date of the appraisal, at one thousand dollars ($1,000.00) a month, indicated a net return after deduction, thirteen hundred and nine dollars and sixty-two cents ($1,309.62) for taxes, three hundred and sixteen dollars ($316.00) for insurance, would net the owner six point eighty-two per cent (6.82%) on valuation of one hundred and fifty-two thousand ($152,000.00).

"The normal rate of return expected by a prudent investor, on a property of that type, is usually a minimum of six per cent (6%). This illustration is furnished to illustrate to the Court that the owner was getting slightly above what is commonly referred to as the 'economic rent.'

"The last phase of the lease, at eleven hundred dollars ($1,100.00) per month, as you will note there on the income approach, after deduction for taxes and insurance it would net nine point thirty per cent (9.30%).

"On the one hundred and fifty-two thousand dollar valuation ($152,000.-00), in the last phase of the lease, the

owner would actually net seven point sixty-one per cent (7.61%) on the one hundred and fifty-two thousand dollar ($152,000.00) valuation. That showed an average, over the entire term of the lease, of six point forty-two (6.42), which is slightly above six per cent (6%) net on the overall term of the lease."

Mr. Jordan further testified as follows:

"Q. You did not take into consideration, in figuring these, the fact that we ascertained in court yesterday that the tenant, in addition, had to pay a twenty-two hundred dollar ($2,200.-00) paving lien on this property, did you? A. No, I did not.

"Q. That would make the actual return on the investor's investment even a little higher, would it not, if you took that into consideration? A. Yes, because that applied to a capital improvement."

5. "The general rule is that the measure of compensation to be awarded the owner in expropriation proceedings is the price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy—in other words, the market value of the property. There are exceptions to this rule. In cases where there is no market value for a residence sought to be expropriated, the intrinsic value, or its value to the owner, must be taken into consideration; otherwise he might be deprived of his property without just and

A review of the above evidence discloses that no market value for the expropriated lease was proven.

Defendant contends that where there is no market for the property expropriated the price to be paid must be determined from the best available evidence of the property's intrinsic value (Housing Authority of Shreveport v. Green, 200 La. 463, 8 So.2d 295, 298 [5]), and that where no market exists for a lease its value is the capitalized value of the difference between the fair rental value of the property and the rentals provided in the lease (In re Morgan R. R. & S. S. Co., supra).

We have no quarrel with defendant's contentions, but, in expropriation matters the defendant has the burden of proving his claim. LSA–R.S. 48:453; State of Louisiana Through Department of Highways v. Rownd, Jr., La.App., 119 So.2d 282. He must prove that he has sustained a loss susceptible of proof with reasonable certainty. Cf. Scheinuk the

reasonable compensation. The compensation to which the owner is entitled is the full and perfect equivalent of the property taken—in other words, the loss caused to him by the taking. 'This means substantially that the owner shall be put in as good position pecuniarily as he would have been in if his property had not been taken'. 18 Am. Jur., § 240, p. 874. This is the rule established long ago and consistently adhered to by the Supreme Court of the United States."

Florist, Inc. v. Southern Bell Telephone and Telegraph Co., La.App., 128 So.2d 683; Tennessee Gas Transmission Company v. Primeaux, La.App., 100 So.2d 917; Central Louisiana Electric Co. v. Leonards, La. App., 65 So.2d 631; Murff v. Louisiana Highway Commission, La.App., 146 So. 328. The burden imposed upon the person having his property expropriated is to establish his claims to a legal certainty and by a reasonable preponderance of the evidence; speculation, conjecture, mere possibility and even unsupported probability are not sufficient to support a judgment. Cf. Dowden v. State of Louisiana Through Department of Highways, La.App., 81 So. 2d 48; Jeanfreau v. Sanderson, 239 La. 51, 117 So.2d 907. The manner of an award for damages in an expropriation case cannot be too remote and speculative. Louisiana Power & Light Company v. Simmons, 229 La. 165, 85 So.2d 251. A fundamental principle of the law of evidence is that expert testimony given in response to hypothetical questions predicated on a statement of unproven facts, has no probative value and should not affect the outcome of a case. Brown v. Aetna Casualty & Surety Company, La.App., 96 So.2d 357. Equitable considerations cannot be permitted to prevail when in conflict with positive written law. Sterbcow v. Peres, 222 La. 850, 64 So.2d 195.

Plaintiff proved affirmatively that the property (land and improvements) it pur-

chased by conventional sale from Goldman and his associates had a value of $152,-000.00 at the time of sale. It further showed that Goldman and his associates under their lease with defendant were realizing an excellent return on their investment.

Defendant offered voluminous testimony as to replacement costs and rates of return on such costs. It also offered testimony as to the value of its business which had not been expropriated, and as to the loss it suffered by the compulsory move forced upon it. It did not prove the "Lessee's Advantage," as was done in the case of State v. Ferris, 227 La. 13, 78 So.2d 493. It did not prove that the amounts chargeable to rent in its new operations were greater than those under its old lease. The 20% of defendant's business which had to be surrendered under its new operations was a consequential damage.

We sympathize with the defendant for the inconvenience suffered and the disruption of business experienced, but, under the facts of this case, defendant did not bear its burden of proof. We cannot hypothecate and speculate—specifically, hypothecating replacement and hypothecating rent—where concrete evidence has been adduced as to land and improvement value and as to lease value. We are constrained to hold that the formula employed by the Court of Appeal is not applicable in this case. State, Through Department of Highways v. Havard, 239 La. 133, 118 So.2d

131. We find, as did the trial court, that under the proof of the case, the "Lessee's Advantage" was worth zero dollars.

For the reasons assigned, the judgment of the Court of Appeal, Second Circuit, is reversed and set aside. The judgment of the trial court is affirmed.

136 So.2d 44