182 So.2d 786 (1965)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Plaintiff-Appellant,
v.
Waldo S. COCKERHAM et al., Defendants-Appellees.
No. 6455.
Court of Appeal of Louisiana, First Circuit.
November 16, 1965.
Rehearing Denied January 24, 1966.
*787 J. Huntington Odom, Kennon, White & Odom, Baton Rouge, Daniel P. Hurley, New Orleans, Carlos G. Spaht, Kantrow, Spaht & Kleinpeter, Baton Rouge, for appellant.
J. Douglas Nesom, of Nesom & Mellon, Denham Springs, Brunswig Sholars, Philip K. Jones, D. Ross Banister, Norman L. Sisson, Baton Rouge, for Department of Highways.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
BAILES, Judge.
Proceeding under the authority conferred upon it by the provisions of R.S. 48:441 et seq., the State of Louisiana, through the Department of Highways, brought this expropriation suit against defendant, Waldo S. Cockerham, as owner, and Texaco, Inc., and Flash Oil Corporation, as lessees, to condemn for highway purposes a certain tract of land in East Baton Rouge Parish. In accordance with a certificate of estimate of just compensation executed by two appraisers employed by the Department of Highways, the sum of $152,700 was deposited in the registry of the court.
All defendants above named filed answer contending that, in substance, the amount deposited by the plaintiff was inadequate compensation for the property expropriated. After trial, the district court rendered judgment in favor of defendants. Waldo S. Cockerham was awarded $147,906; Texaco, Inc., was awarded $16,101; and Flash Oil Corporation was awarded the sum of $3,500. The plaintiff was also condemned to pay expert witness fees in the total amount of $5,700. Defendants, Flash Oil Corporation and Texaco, Inc., appealed and both Waldo S. Cockerham and plaintiff answered the appeal.
The property involved in this proceeding is triangular in shape and contains approximately 1.22 acres located just north of the traffic circle at the intersection of Flordia Boulevard and Airline Highway, fronting on the western side of the Airline Highway or the southbound traffic lanes of the said highway. The fee owner and lessor of the property involved herein is Waldo S. Cockerham, who had leased the property under long term leases to two separate operators of service or filling stations, which were on the property. The northern portion of the tract was leased to Texaco, Inc., a major oil company, and the southern portion of the tract was leased to The Flash Oil Corporation, operating as the Site Oil Company, an independent oil company.
The Cockerham property was triangular in shape, measuring 451 feet along Airline Highway, 476 feet along Airway Drive, the street in rear of subject property, and the south side of the property, the line perpendicular to Airline Highway, measured 238 feet, these measurements being approximate.
On the northern portion of the tract Cockerham had constructed a service station which he had leased to Texaco, Inc., by lease dated February 17, 1954. This portion *788 of the property had a frontage of 235 feet on the Airline Highway, with a depth on the south side of 134 feet. The property, extending to the north, narrowed to a point with the Airway Drive line having a distance of 270 feet. Airway Drive, although a dedicated street, had never been improved. The lease on this property was for a primary term of ten years and provided for two options of consecutive renewal of five years each. The lessee, Texaco, Inc., was to pay as rent the sum of $340 per month during the primary term; $365 per month for the next five years, and $390 per month for the second five year term, assuming, of course, that the options would be exercised.
The Flash Oil Corporation lease on the southern portion was effective April 1, 1956, for a primary term of fifteen years and provided for three consecutive options of five years each. The rent for the primary term was $500 per month, with the rent fixed for each of the successive five year options respectively as follows: $550, $575 and $600. It was provided in the lease that there would be a diminution in rent of $100 per month during each month of the 15 years of optional lease, if the options were exercised, provided that at the end of the primary term, or the beginning of the first five year optional lease period the lessee expended the sum of $15,000 for capital improvements on the site. The property measured 216 feet on the Airline Highway, 134 feet on the north side (the side common to the Texaco leasehold), 238 feet on the south side and 205 feet on the west side.
It was stipulated that the replacement cost of the improvements on the two leaseholds are as follows: On the Texaco lease the amount is $39,885, and on the Flash Oil Corporation lease the amount is $25,386.
There is before us in this appeal the determination and resolution of the value of the immovable property, that is, the land and improvements owned by defendant, Cockerham, and the value, if any, of the Flash Oil Corporation lease which had an unexpired existence or duration of 24 years, and the value, if any, of the Texaco, Inc., lease which had an unexpired duration or existence of 12½ years.
The Plaintiff-State's position is that the State is obligated to pay into the Court for division by the Court unto the parties entitled thereto the exact sum that a willing buyer would have paid a willing seller for the property herein involved, as if unencumbered, as of the date the order of expropriation was filed.
It contends that the amount of the Court's award, in this case, should be market value of land as improved figured free and clear of all encumberances. In such a case as this, it is the Court's duty to divide the money according to the value of the respective interests of the various parties in the real property.
From the above we gather that it is the State's position that it owes nothing more or less than the fair market value of the immovable property, including improvements, expropriated, that whatever interest or right the lessees have, if any, for remuneration for loss of lease advantage is to be paid to the lessees from the fair market value; that this amount, if any, due lessees is to be paid to them from the fair market value of the property owned by Mr. Cockerham.
Our examination of the law on the subject of expropriation of property encumbered with a lease leads us to a consideration of the three leading cases dealing with this type of expropriation. These cases are In Re Morgan R. R. and S. S. Co. (1880) 32 La.Ann. 371; State v. Ferris, (1955), 227 La. 13, 78 So.2d 495; and State, Through Department of Highways v. Levy, (1961), 242 La. 259, 136 So.2d 35.
In the case of In Re Morgan R. R. and S. S. Co., supra, the plaintiff-expropriator expropriated a certain lot of ground in the City of New Orleans. The owner had leased the property for a term of three years, with the privilege granted the lessee *789 to renew for an additional three years. The stipulated rental was Sixty Dollars per month. The lessee operated on this property a coal yard. The question before the Court was to determine whether the expropriator owed the lessee anything for the lease, and if so, how much. We find this case so pertinent to the issues before us that we are quoting at length from the opinion of the Court therein.
In discussing the attributes of ownership, the Court said at Page 375:
"Perfect ownership gives the unlimited right of disposal and enjoyment. C.C. 491.
"Imperfect ownership gives these rights only `when it can be done without injuring the rights of others, that, of those who may have real or other rights to exercise upon the same property.'"
In discussing the relationship of the lessee to property that is expropriated, the Court observed:
"The rights of use, enjoyment and disposal are said to be the three elements of property in things. They constitute the jura in re. The right of a lessee is not a real right, i. e., a jus in re. In other words, the lessee does not hold one of the elements of property in the thing. His right is a jus ad rem, a right upon the thing. While therefore, technically, the lease of real estate does not operate a divestiture of any elements of property, it does by the express terms of article 492 C.C. prevent or encumber the exercise of the right of perfect ownership. That article says that not only real rights but `other rights' vested in third persons, limit the exercise of full ownership. The right of a lessee is substantive, and is independent of changes in the ownership of the thing. C.C. 2733. The purchase or expropriation of the rights of the owner does not therefore necessarily embrace or operate upon the right of the lessee. That right in order to be affected must be itself the object of purchase or expropriation. If the rights of the owner are alone the objects of the purchase or expropriation, the right of lease is unaffected and continues. The purchaser gets only the thing encumbered by the lease. That is all he can get, for that is all the owner has. In other words, the purchase or expropriation of the owner's rights gives simple subrogation thereto, no more, no less. This of course gives the right to take any sums, falling due, in future, for rents of the thing."
The Court then considered the proper relationship of the expropriator to the lessee after the rights of the owner were acquired by the expropriator:
"We find therefore that the rights of the owner, expropriated by the company, constitute the measure of its rights against the lessee. What are those rights? They are:
"FirstThe full ownership of the thing encumbered by a lease.
"SecondThe monthly rents, at sixty dollars per month, during the term of the lease.
"But the company has also demanded the expropriation of this right of the lesseethis encumbrance upon the full ownership. If that right is worth no more than the lessee has agreed to pay for it, then, as the price, or rent in futuro, is yet to be paid, and as the company holding the owner's rights, is the payee thereof, the company would owe the lessee nothing. But if this right is worth more than the sum so agreed to be paid for it, the lessee is certainly entitled to be paid the amount of this excess. He must have the value of the right which is taken away from him.
"But it is said that the company having paid the owners the value of the property in full ownership, the amount *790 to be allowed the lessee must be taken out of the sum awarded to the owners. This would be just in the case when the owners had received in advance the rents, and where the right of lease was worth no more than the sums paid for it. But where the value of the property has been fixed, as in this case, by reference to the rent stipulated, and not by reference to the actual present value of the lease, and where the company becomes subrogee of the owner of the stipulated rents, it would be exceedingly inequitable to charge the owner with this difference between the stipulated rent and actual value of the lease. Such a process might result in giving the owner absolutely nothing where he had granted a lease at a small price, and when from unforeseen and temporary causes the leasehold had acquired an extraordinary and unexpected value. In this case all the experts, the commissioners, and the court evidently fixed and predicated the value of the lot by reference to the rental stipulated in the contract of lease. If the price of the fee is to be charged with and diminished by the difference between the stipulated rents and the actual present value of the leasehold, then the price of the fee should have been calculated on a rental equal to such actual present valuea process which would have largely increased the amount to be paid the owners of the fee.
"We understand that the $8000 awarded to the owners in compensation for what the company takes and acquires from them. We have seen that this consisted of, first, the ownership in fee, encumbered by a lease, and, second, the rent stipulated in that lease. What the owners have cannot be taken from them. They are to be paid only for what was taken from them, and are to be charged only with what they received. The right of the lessee did not belong to the owners of the fee. It was a substantive right vested in him, and its acquisition by the company is derived from and through him. He is to be paid its value, i. e. the excess of what it will bring over what he has agreed to pay for it, and that excess cannot, in this case, be justly charged upon the amount awarded the owners.
"The only true test of this excess of the value of the lease over the stipulated rental or price thereof, is to ascertain what sum the right of lease, or leasehold, will bring over and above the rent stipulated to be paid. In the case before us the rental is sixty dollars per month. If the right of lease would sell for seventy-five dollars per month of its term, then the excess of its value over its price is fifteen dollars per month."
Then the Court, in very clear and certain language, set forth the formula to apply to the facts to determine what, if anything, the lessee is entitled to for the taking of his lease. On Page 377 the Court stated:
"The true question is, what advance could the lessees get for the lease over the price or rent they are to pay? In other words, if the lease was put on the market for sale, what sum in excess of sixty dollars per month could be obtained for it, the improvements put thereon by the present lessees being excluded from the calculation? These improvements belong to the lessees, the lessor or owner having the right of electing to keep them at an estimation. The owner and not the lessee has this right of election, and he cannot be compelled to take them, it being by law a matter of option on his part. The commissioners and the court erred, therefore, in charging unconditionally these improvements as part of the amount to be paid by the company. C. C. 2726, 508."
Before passing from our observation of this Morgan case, and to answer any question *791 that might arise as to for what term the lease advantage is owed by the expropriator, in the decretal portion of the opinion, it was stated:
"First. By fixing the amount to be paid the lessees for value of their lease at fifteen dollars per month from the date of the company taking possession to the expiration of the term for which said lease may continue. * *." [Emphasis supplied]
In the case of State v. Ferris, supra, the court was confronted with the question of whether the lessee of a building was entitled to compensation for his lease, and if so, how much. Therein the State, through the Department of Highways had expropriated a lot of ground in the City of Shreveport for the purpose of constructing a portion of a highway. On this lot of ground was a building originally leased to a party named Wall; however, Wall had assigned all his rights in this lease to defendant, Elkins. The question to determine was market value of the lease. On Page 24 of 227 La., on Page 497 of 78 So.2d, the Supreme Court quoted approvingly from the Morgan case, and on the basis of the pronouncements of that case decided the rights of the lessee.
In the other case, that of State, Through Department of Highways v. Levy, supra, the State, Through the Department of Highways, expropriated a lot of ground on which there was a building under lease by the owner to the defendant, Levy. While the Court found that the "evidence discloses that no market value for the expropriated lease was proven," its discussion of the law applicable to the expropriation of leases is based on the holding of the court in the Morgan case.
Hence, in the expropriation of property encumbered with a lease, the rights of both the owner and the lessee must be reckoned with in acquiring perfect ownership. The owner, of course, must be paid the fair market value of the property taken; and the lessee must be paid the fair market value of any lease advantage he possesses. Two separate and distinct sets of rights are being acquired in the taking. Where an owner has granted a lease on the property taken, he is powerless to transfer to the expropriator any greater right of ownership than he possesses at the time. The lessee, through the lease, has acquired certain rights on the property. These are entirely distinct from those retained unto the lessor. For the expropriator to acquire perfect ownership, he must expropriate the rights of the lessee, and in doing so, he must compensate the lessee the fair market value of those rights. The amount the expropriator owes the lessee is the monetary difference between the rent he has contracted by the lease to pay to the lessor and the price that the property would lease for at the time of the taking. Stated another way: The expropriator owes the lessee the difference between the contract rent and the economic rent; the contract rent being that which the lessee contracted to pay to the lessor and the economic rent being that which the property would bring on the market at the time of the taking. The difference between these two amounts is what is called lease advantage. If there is a lease advantage, the expropriator must pay the value thereof to the lessee. This amount is not owed by the owner to the lessee unless the owner has received the rent in advance or the value of the owner's property has been fixed in relation to the present actual value of the lease. If the value of the owner's rights have been determined in reference to the contract rent, the expropriator owes the lessee for the value of his rights taken; however, if the value of the owner's rights have been fixed in reference to the economic rent, then the lessee's rights will be compensated for from the proceeds paid to the owner. If there is no lease advantage, the expropriator owes the lessee nothing. See: State Through Department of Highways v. Levy, supra.
*792 The plaintiff presented the testimony of the following-named expert appraisers: Edgar A. Tharpe, Jr., and Max J. Debres, Jr., both of New Orleans; Chester A. Driggers and J. B. Pugh, both of Baton Rouge; defendant, Waldo S. Cockerham, offered the testimony of Kermit A. Williams and Verdies Reece Perkins, both of Baton Rouge; Texaco, Inc., presented the expert testimony of Julius Bahlinger and William W. Munson, both of Baton Rouge; and Flash Oil Corporation presented expert testimony through witnesses Calvin Houghland, Hugo Wynn, Bert Brumfield and Alvin K. Seago.
Ordinarily, compensation due the owner of the property expropriated is the fair market value determined and calculated from the price of voluntary sales previously confected between a willing seller and a willing buyer. Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541; State through Department of Highways v. Ragusa, 234 La. 51, 99 So.2d 20; State through Department of Highways v. Gifford-Hill & Co., Inc. (1963) 245 La. 462, 158 So.2d 448.
In the case of State v. Lewis (1962) 142 So.2d 652, at page 655, this court said:
"[6, 7] The jurisprudence of this State recognizes that the best measure of compensation or market value is obtained through the use of comparable sales. However, in the absence of such comparable sales, a valuation based upon rental income from the property may be resorted to, and further, even where there are comparable sales, utilization of the rental income may be resorted to for the purpose of supplementing the appraisal. * * *"
All expert appraisers for all parties agree that the correct manner to determine the market value of property expropriated is through the income approach. We will follow their expert opinion in this case becase of the lack of acceptable comparable sales. While several of the so-called comparables are perhaps helpful none appear persuasive of value. The subject property on which the Texaco service station is located is of a non-comparable shape with all cited previous sale and the depth of the Flash site is deeper than some and not so deep as others. We therefore incline to follow the income approach to value herein.
Further, practically all of the witnesses agreed that the general area of the subject property is one of the fastest growing and developing areas of Baton Rouge and was described by one witness (Mr. Munson) as the "hub of growing Baton Rouge." Witnesses further agreed that the highest and best use to which the subject property could be put was the use which defendants were making of it, namely, service or filling station use.
In expropriation proceedings the value of the property taken should be based on its highest and best use. State through Department of Highways v. Crockett, (1963) La.App., 151 So.2d 496.
Plaintiff's witness, Edgar A. Tharpe, Jr. stated that he used three methods to arrive at his estimation of value. He stated that two methods applied to all parts of the property, namely the cost approach and the income approach to value and the third method, market date approach, applied to the value of the land. He also stated that he placed more emphasis on the income approach. He set out, in making his appraisal, to establish an economic rental; this rental to be used in calculating or establishing value of the leases. In doing this he claims to have investigated each "leg of the circle" or both sides of the two streets leading into the circle. He further asserts that he found many comparables of land leases involving major oil companies and also found comparables of leases involving land and building all being used as service stations.
*793 He enumerated the following as comparable:
1. Shell station at the corner of Hammond Highway and Madeline Courts, leased for 17 years with two 5-year options for $389 monthly rental; lease dated September 1957. No gallonage declared.
2. Esso Standard at corner of Oak Villa Blvd. and Hammond Highway, leased for 15 years with five 1-year options for $400 monthly rental; lease dated January, 1955. The rental provided was $350 per month for first five years, $400 per month for second five years and $450 per month for third five years. The gallonage was estimated at 28,000 per month.
3. Gulf at corner of Cora and Hammond Highway. 15 year lease with two 5-year options for $366 per month for primary term, with $455 per month if option exercised. Date of lease is March, 1957. No gallonage declared.
4. Esso Standard at Sherwood Forest and Hammond Highway. 15 year lease with five 1-year options. Rental schedule is $425 per month for first five years; $475 per month for second five years, and $525 per month for third five years. If options exercised rent is to be $575 per month. Lease dated January, 1959. Gallonage is 48,700 per month. All of the above stations used as comparables were located on service roads.
Mr. Tharpe testified as follows: Page 321 of Transcript.
"The point in bringing out these comparables of land and improvements that are under lease would provide the appraiser with some background of what the market was doing and what they were paying per month. With this general knowledge it served as a guidepost, as assistance to the appraiser to arrive at his economic rental for the subject property based on its location and it was my considered opinion that the estimated economic rental for the Texaco station without the equipment furnished by Texaco and subject to removal at the end of their lease * * * that the estimated economic rental was Four Hundred Seventy-five Dollars."
And, now referring to the Flash Oil lease, he stated: Page 323 of Transcript.
"With an existing contract rental of Five Hundred per month and assuming this to represent an arms length transaction in 1956 it was my considered opinion realizing the location of the property and the future of the property that this would tend to set the lower limit of value when estimating the economic rental. On Flash Oil Corporation with a knowledge and a study that I had made in the market on the four legs in Baton Rouge regarding oil companies, it was my considered opinion that the gross economic rental was Six Thousand Six Hundred per year."
He made the following conclusions as to value of the property: That the Flash Oil Corporation property was worth $70,700, and that the Texaco property was worth $64,400, thus concluding that the whole property had a value of $135,100. This witness reached no conclusion on the value of the leasehold to either Flash Oil Corporation or to Texaco, Inc. It is worthy of note that Mr. Tharpe testified that during his career as a realtor he had never negotiated the sale of a going service station or filling station.
The next plaintiff witness was Max J. Derbes, Jr. He appraised the property to be worth $130,450, breaking down this estimate to include $40,400 for improvements and $90,050 for the land. He testified that in his opinion the Flash Oil Corporation station had a rental value of $7,000 and the Texaco station had a rental value of $6,000. In arriving at this economic rental, Mr. Derbes testified that he used the same *794 leases that Mr. Tharpe used as comparables. In rebuttal, he testified that Texaco had a leasehold interest valued at $14,408, and this is based on an economic rent of $500 per month. He calculated and estimated the Flash Oil Corporation monthly economic rental was $600 per month, and that Flash Oil Corporation had no lease advance whatever, and that their leasehold was not worth anything. However, he used no lease dated between 1959 and 1962 in arriving at economic rentals. He also observed that the gallonage that a filling station would pump is not necessarily a good method of arriving at the value of real property for filling station purposes. Also, he admitted on cross-examination that he had never sold a service station with a lease or sold a lease on a service station. In addition to the value he finally arrived at, he testified that he calculated the value of the property by considering all pertinent sales in the subject, consisting of from 30 to 40 individual transactions and he determined in this manner a value on the land of $85,000 when he applied the front footage price. According to his deductions he fixed front foot cost approach a price of $208 per front foot on the property occupied by Flash and a price of $170 per front foot on the portion occupied by Texaco, or an average price of $188 per front foot.
The State next offered the testimony of Mr. Chester A. Diggers. He, like all the other appraisal experts used the various approved methods of arriving at the value of the subject property, but he relied on his calculation of value arrived at through the income data approach. He, like all the other witnesses, investigated the various sales in the subject area.
His testimony follows: Page 564 of Transcript.
Q. What methods did you use in arriving at your conclusion of market value of subject property as of date of laking?
A. I relied on the income data approach to value. That makes use of the land value by comparison and capitalization of the income stream for the property.
Q. Did you use any methods to check this?
A. Only rule of thumb check, nothing that I ____.
Q. As of the date of taking what in your opinion was the amount that a willing buyer would have paid for it, in other words, what was just compensation for the property taken?
A. My estimate of value was based on the property being free and clear of encumbrance. It involved the land and the two service stations. It involved the equipment owned by Mr. Cockerham at the site station and excluded the equipment owned by Texaco and the estimate of value of the realty was a total of One Hundred Fifty-two Thousand, Seven Hundred Dollars. I might add that I believe that that is the amount that the expropriationthat the property was expropriated for.
On rebuttal, this witness testified that in his opinion the value of the Cockerham interest had a value of $136,424, and the value of the Texaco, Inc., interest amounts to $16,276.
He was asked by counsel for the plaintiff: Page 1268
Q. What in your opinion was the value of what Flash Oil Corporation has to sell as of the date of expropriation?
A. Based on my estimate Flash Oil Corporation station was leased at economic rent and I didn't think they could sell at a profit.
*795 The last witness to testify for the plaintiff was Mr. J. B. Pugh.
On direct examination he estimated the economic rent to be $500 per month for the Flash lease as of date of taking. He testified he calculated the value of the property from market value approach and also from income approach using the above cited economic rent as income. He used principally the same properties used by the other witnesses in arriving at market value from cost approach. He fixed the value of the subject property at $149,500.
In arriving at a value on the land, he testified to the following procedure: Page 704
Q. In your cost approach did you arrive at thewhat the value of the land was in your opinion?
A. Yes sir.
Q. What method did you use?
A. The first method I used was by comparing known land sales to subject property taking those which in my opinion were most indicative of the value of subject property in arriving at a value of the land. Then I utilized the cost information by Mr. Rockhold which has been stipulated into this trial.
On rebuttal, Mr. Pugh testified that Texaco, Inc., enjoyed a lease advantage because in his estimation the economic rent was greater than the contract rent. By an elaborate computation he concluded that Texaco, Inc.'s lease had a value to it of $5053. Without any explanation or elaboration, Mr. Pugh testified simply that the Flash lease had no advantage. In other words, the economic rent value and contract rent value were of the same amount.
We now consider the testimony and conclusions of the experts who were presented by the defendant, Waldo S. Cockerham.
Mr. Kermit A. Williams, a realtor of Baton Rouge, was accepted as an expert by the court. Just as most of the other experts did, he used three approaches to value and as the result of the summation method he concluded the value was $174,000 and the income approach resulted in a total value of $156,300.
He testified as to general knowledge of the subject area and to commercial activity and conditions in this area. He used basically two approaches to value and confined his appraisal to the value of the property owner's interest in the said property.
One approach used by Mr. Williams was the summation approach, and in doing so he accepted the valuation of improvements made by Mr. Fontenot and stipulated to by all parties. He calculated that the Texaco filling station had a depreciated value of $29,914, to which he added the value of the land. Based on market comparables, and allowance for the fact that the lot was triangular in shape and not the same depth as the other property, a front footage value of $250 per foot was assigned, or a computed value of $59,000. The value of improvements, plus value of land, reached a value of $88,914.
On the Flash filling station, the depreciated value of building amounted to $20,310, to which was added the land occupied by this station. This lot had a greater depth and a different shape. Based on market sales of other property in the vicinity and neighborhood, a value of $300 per front foot was assigned. The appraised value of this lot was $64,800. By adding to this amount the depreciated value of the building, a total valuation amounts to $85,110. The summation approach gives us a total evaluation of land and improvements of $174,014.
Now approaching an appraised value by way of income, this witness employed the contract rent as income. An average rental per year during duration of leases netted *796 the owner $10,755. Deducted therefrom was taxes of $400, leaving a net of $10,355.
The total land value based on market estimate came to $123,800. Using a six per cent return on land, the indicated return was $7,428, thus leaving $2,927 as remaining income attributed to the improvements on the land. He estimated a useful life of these buildings of 33 years [this was done even though Texaco had an estimated life of 30 years and Flash 20 years], thus permitting a recapture of capital by the owner on a three per cent capitalization rate. He then added a pure interest rate of six per cent, bringing the total capitalization to nine per cent which, according to Mr. Williams, gave the owner a return on his investment and a recapture of investment. Using the nine per cent capitalization rate against the remaining income attributed to the buildings of $2,927 indicated a value of $32,500 for the buildings. By adding the latter amount back to the market value of land of $123,800, gives an appraisal from the income approach of $156,300.
Thus the summation method yielded an appraisal of $174,000 and the income method yielded an appraised value of $156,300. Mr. Williams averaged these two findings and reached the assigned value of land and buildings to the property owner, as of the date of taking, of $165,150.
This witness testified that he used the Laborde to Stardust Motor Hotel, the Pollard to Malco Realty sale, Pollard to Magnolia Realty, Bird to Sears, Hannie to Owens sales in assigning the front footage price to subject property.
The other expert witness who appeared for the defendant, Cockerham, was Mr. Verdie Reece Perkins, a Baton Rouge realtor. He reached, through the process of averaging the values produced by the two approaches he used, an appraised value of $157,733. These two approaches were explained as follows in his testimony. Page 232.
A. * * *. I used two approaches in arriving at the value, and then I averaged them. First I used the reproduction cost less depreciation basing my figures on the cost estimates previously put in the record which were given by Mr. Fontenot. On the Texaco station, reproduction cost of Thirty-nine Thousand Eight Hundred Eighty-five Dollars. I used a depreciation of twenty-four per cent which was three per cent a year for eight years. That figure is Nine Thousand Five Hundred Seventy-two Dollars. That left Thirty Thousand Three Hundred Thirteen Dollars. For the Flash Oil Corporation or the Site Service station reproduction cost of Twenty-five Thousand Three Hundred Eighty-six Dollars. Depreciation, four per cent a year for six years, Six Thousand and Ninety-two Dollars, leaving a balance of Nineteen Thousand Two Hundred Ninety-four Dollars. Adding the two figures together, that is, the two depreciated figures gives you a total of the improvement value of Forty-nine Thousand Six Hundred Seven Dollars. As to the land, the Site station, two hundred sixteen feet front at Three Hundred Dollars a front foot makes a total of Sixty-four Thousand Eight Hundred Dollars. The Texaco site which was a triangular corner, two hundred thirty-six feet front at Two Hundred Twenty-five Dollars a front foot, Fifty-three Thousand One Hundred Dollars. I would explain the comparables later, but I would like to say that at this point that I added twenty-five per cent to that site first because it was a corner although the street to the rear was not installed, it was a corner. I then deducted forty per cent because of (sic) it was a triangular shaped *797 piece, it had no depth at one side. That gives a total land value of One Hundred Seventeen Thousand Nine Hundred Dollars. Add the One Hundred Seventeen Thousand Nine Hundred for the land to the Forty-nine Thousand Six Hundred Seven Dollars for the improvements makes a total of One Hundred Sixty-seven Thousand Five Hundred Seven Dollars, the figure arrived at on that method. Taking the income approach the Site (Flash) Station, the land is Sixty-four Thousand Eight Hundred Dollars, at six per cent gives Thirty-eight Hundred Eighty-eight Dollars a year. The Texaco land, Fifty-three Thousand One Hundred Dollars, at six per cent gives Thirty-one Hundred Eighty-six Dollars per year. To make the record clear I will at this time give it to you station by station so there won't be any confusion later. The income from the Texaco station, total income was Four Thousand Eighty Dollars a year. I deducted the land income of Thirty-one Hundred and Eighty-six Dollars. That left Eight Hundred Ninety-four Dollars a year that could be attributed to the improvements on that site. Using a ten per cent formula I put the value of the improvements at Eight Thousand Nine Hundred Forty Dollars, making a total for the Texaco station of Sixty-two Thousand Forty Dollars. Now, on the Site (Flash) station the land, Sixty-four Thousand Eight Hundred Dollars, at six per cent I have the figures but I don't have my carry forwardThirty-eight Hundred Eighty-eight Dollars a year. Now, the income from the Site was Six Thousand Dollars a year. Deducting Thirty-eight Eighty-eight from the Six Thousand leaves Twenty-one Hundred Twelve Dollars per year that you could attribute to the improvement income and on the ten per cent formula would give Twenty-one Thousand One Hundred Twenty Dollars, so, therefore, the total for the Texaco station would be Sixty-two Thousand Forty Dollars, Site would be Eighty-five Thousand Nine Hundred Twenty Dollars, so that the total income approach would give a figure of One Hundred Forty-seven Thousand Nine Hundred and Sixty Dollars. I added that to the One Hundred Sixty-seven Thousand Five Hundred Seven Dollars which was the cost approach, divide it by two and thus that gives you my figure of One Hundred Fifty-seven Thousand Seven Hundred Thirty-three Dollars. Now, the comparables would you * * *."
Texaco, Inc., offered the testimony of Mr. Julius Bahlinger and Mr. William W. Munson, both Baton Rouge realtors, to prove the value of their lease.
Mr. Bahlinger testified that he appraised the interest of Texaco, Inc., to be worth $17,000 based on an economic rent of $530. This lease had an unexpired duration, assuming the options were exercised, of twelve and one-half years. He related that he had studied and compared a lease from Musacchia to Texaco on the New Hammond Highway; a lease from Webb to Texaco on the Airline Highway, one-half mile south of the traffic circle; another lease from Reymond to Esso on Plank Road; also one from Favel to Esso at the interchange of Scenic Highway and Airline Highway. From his study of these leases he deducted that the Texaco lease offered an advantage to Texaco, Inc., of $17,000. This amount was determined by taking the economic rental of $530 and subtracting therefrom the contract rental. He used this difference as a bonus value which was capitalized by use of the inward capitalization *798 tables. He employed a six per cent capitalization rate. The result was the figure of $17,000.
In making his study, Mr. Munson used the same Webb, Reymond and Musacchia leases considered by Mr. Bahlinger, and in addition, he used the Armstrong-Montesano Chemical Co. lease of the Orbit filling station located one-half mile north of subject property. Mr. Munson concluded that Texaco, Inc., had a lease advantage. He determined the economic rental to be $550, and through use of the same method of calculation as used by Mr. Bahlinger, he obtained a value to Texaco, Inc., of its lease with Cockerham of $18,991.26, which he rounded off to $19,000.
Thus we have the amount calculated by Driggers to be $16,276 by Derbes of $14,408, by Bahlinger of $17,000 and by Munson of $19,000. Mr. Driggers and Mr. Derbes, being plaintiffs; witnesses and the other two gentlemen appearing for defendant, Texaco, Inc. It appears to us that each of these calculations are well grounded in fact and there is no more than an understandable variation in their calculations. We conclude that the best we can do is to average these appraisals and adopt the average as the lease advantage held by Texaco, Inc. This average amounts to $16,671.
Considering now the claim of Flash Oil Corporation for recognition of its claim for lease advantage, we find a complete lack of agreement whatever between the plaintiff's witnesses and defendant, Flash's witnesses, except Mr. Derbes testified that if Flash exercised the option to expend $15,000 in capital improvements the advantage obtained by discounting the $100 reduction at six per cent equals a value of $8,106. He also testified that for each dollar above the $600 economic rental as determined by him that the rental increased it would add $154 to the lease advantage of Flash. In other words if the economic rental value was in fact $700 that would add 100 times $154 or $15,400 to the lease advantage held by Flash. Mr. Driggers and Mr. Pugh found no lease advantage to Flash.
Flash offered the testimony of Mr. Howard Kanefield, vice-president in charge of marketing of Flash Oil Corporation who testified that this station had a stable operation. Also Mr. William J. Goram, supervisor of the Louisiana district, testified that he had supervision of subject station, that he visited the operation frequently, that the gallonage production by this station was above normal and he attributed this to location of the station; he stated that no special inducements were offered to purchasers and that the price was in line with competition and with their other stations in this area.
Mr. Bert Brumfield testified that his company once owned a Shell station across the Airline Highway from subject station, that he had observed its operation. His opinion was that this was a premium location. Particularly of note in his testimony is his explanation of how price is fixed in the sale of a lease on a service station. He related that he had sold the Shell station across from subject property to Shell Oil Company. Page 1066.
Q. And what price did you get and how was the price fixed for this lease to Shell Oil Company?
A. We took the last three years and got an average gallon per month and the company paid two cents per gallon discounted, that is, the rent, a net value of that lease for the "x" number of years we had, which I believe it was eight.
Q. They took the average gallonage over the sale of gasoline over the past period of three years?
A. Three years.
Q. And you say they paid you two cents a gallon?
*799 A. Two cent a gallon.
Q. Do you remember what the estimated gallonage was at that time?
A. I believe we figuredestimated it came out at twenty-five thousand gallons per month, which they paid us Five Hundred Dollars per month discounted.
Q. And what was the difference in the contract rent and what you got from Shell Oil Company?
A. It was One Hundred Fifty a month.
Q. And you say that was discounted. Do you remember the rate of discount that they used to give you the present value of the dollar?
A. I believe it was six per cent.
Mr. Calvin Houghland, former owner of Direct Oil Company testified. He was owner of a company that owned and operated a total of 132 stations over a twelve state area. He had been in this business for more than twenty-five years and devoted his time to the operation of independent stations. He had served on the executive committee of the American Petroleum Institute, was for a number of years an officer and director in the Florida Petroleum Marketers Association, an organization of both major and private brand marketers. He was one of the founders of the Society of Independent Gasoline Marketers of America and had served on its board of directors.
He stated that he had viewed the subject station and area; that location of the station is of more importance to the independent oil company than to a major company. In his testimony he detailed and discussed the factors that go to make a good location. He discusses this in the following testimony: Page 957.
Q. Now, when you say good location what are the factors that make a location a good one?
A. Well, as I say I had a staff and spent many thousand of dollars and many many years trying to work out a formula and we think we have made as much progress as anybody in the country, but there is still the unknown, number one, of course, you have to have traffic and with a given substantial traffic you have to be able to handle that traffic through ease of ingress and egress. You have to have visibility. You have to have traffic that is not too fast, you have to have traffic that is not backed up by a stoplight thus cutting off all your approaches to the station of your available means of getting out of the station. There are many many factors, I think I have hit on the principal ones there.
This witness testified that this particular location possessed all the attributes of an ideal location. He said that gallonage was the chief factor in determining market value of this lease.
He further testified that he had examined this lease, its conditions and terms, the location, the gallonage charts over the past three years, and in his opinion this lease was worth and he appraises it to have a present value of $71,000.
It is noted that the trial court accepted Mr. Houghland as an expert witness.
Mr. Hugo C. Wynn, Chief engineer and operations manager for Triangle Refineries, Incorporated, a Kerr-McGee interest, whose educational background is mechanical engineering, testified that he handled the purchasing of leases and going operations in expanding the filling station operations of his employer. He related that during the past two years he has appraised about 1500 to 2000 different service stations and has acquired 258 of these. He detailed desirable factors which followed the same general discussion of witness, *800 Mr. Houghland. He stated that in his opinion the subject property was an excellent location.
His testimony as to value of this lease follows: Page 1041.
Q. Mr. Wynn, the records as you know here show that the gallonage during the past year of operation here was something slightly in excess of seventy thousand gallons per month. What would you say about a station that produces that sort of gallonage? What would that indicate?
A. It would indicate on this basis, that we arenot we, an one in the industry is trying to buy a location that is the kind of location that everyone that is trying to secure independent operations is looking for and a willing buyer would be well, I don't think you would have a willing seller in this case, but a cent and a half a gallon without any problem at all, a cent and a half a month per gallon as a rental basis and then, of course, in addition to that we would be expected to buy the movable equipment, the pumps. Lights and so forth and those kind of deals are being made every day.
Q. Then in this case if you took the gallonage as proven to be seventy thousand gallons what would be the rental that you would be willing to pay on that station?
A. Well, you would go seventy thousand gallons I think this is a rough estimate of what I would start with in trying to lease it. My own estimation, what I would start with is One Thousand Dollars a month and would hope I could do business on that basis.
Q. Is there any question in your mind that the value of this lease based upon your observations and study and so on is worth One Thousand Dollars a month?
A. Is there any question that it is worth it?
Q. Yes, sir?
A. No, sir, there is no question in my mind.
The Court accepts Mr. Wynn as an expert.
Defendant, Flash, offered the testimony of Mr. Alvin K. Seago, a realtor and appraiser of Baton Rouge, who was accepted as an expert. Mr. Seago made a detailed study of the filling station leases along the same manner as did the plaintiff's experts and those of Texaco, Inc.
The result of his study of all pertinent factors, and in his opinion, the value of the leasehold was $53,090 which he rounded to $53,000. This was calculated on an economic rent of $1050.
When asked how he arrived at the economic rent of One Thousand and Fifty Dollars a month, he stated: Page 1106.
A. I considered the various methods which I found that were used by persons who bought and sold leaseholds and I considered the methods that they used there in arriving at the economic rent of this particular property. I used not just one, but I used several. I might mention two particular methods that I gave consideration to. One was the matter of taking the proven volume and multiplying that by a given amount per gallon and then deducting the present rental that was specified in lease and discounting itmat the prevailing interest rate. I came up with a considerably higher indication of value from this method, in fact, I came up with an estimate from that method of Seventy-four Thousand *801 Dollars. Seventy-four Three Ninety-five is the figure actually. Using another example that was in line with what I found as frequently done, that is, using the average monthly gallonage over a given period of time and multiplying that by One Dollar per gallon per month and that case using the monthly average gallonage over a three year period for the station I received an indication of approximately Sixty-six Thousand Dollars as the value from that method.
Q. Based upon your investigation and study is it your opinion that the economic rent of this station was One Thousand and Fifty Dollars a month in May of 1962?
A. It is.
Q. And taking all these things into consideration you reached a value of this lease of Fifty Thousand Dollars. Is it your opinion that that is a fair and reasonable value of the rights that the Flash Oil Corporation has under this lease as of the date the State took it in May of 1962?
A. It is my opinion that the value of this leasehold is Fifty Thousand Dollars and could be sold for that amount.
In correlating the testimony of Mr. Driggers on the computation of value of economic rent and the testimony of Mr. Houghland, Mr. Seago and Mr. Wynn as to what the fair economic rent is for this station, and also giving due weight and consideration to the testimony of Mr. Bert Brumfield, we find the difference between the contract rent and the economic rent to be $450. (The contract rent being $600 and the economic rent $1050) We arrive at a discounted value of this lease of $69,300. This amount is arrived at through use of Mr. Driggers' computation of value that for each one dollar that the economic rent exceeds $600, that one dollar has a value of $154, hence 450 times $154 equals $69,300. Compare this evaluation with Seago testimony on page 1106 of transcript quoted supra.
In our determination of value of this property, we do not believe that the State's expert witnesses properly appraised the value of the filling or service station lease. All of them readily admitted that they had no prior experience in determining such value, nor had they ever trafficked in such type lease. We are favorably impressed with the testimony of witnesses, Messrs. Houghland, Wynn, Seago and Brumfield. All but Seago have had actual experience in dealing with service station leases. We believe the approach to value testified to by these witnesses is more realistic and entitled to greater weight than the State's experts. In comparing the net result of Texaco's witnesses, Bahlinger and Munson to the criteria of value testified to by Flash's witnesses, we are more impressed with the correctness of Texaco's witnesses' calculation of value than with some of the State's experts' conclusions of leasehold values.
None of the State's witnesses found that Flash's lease had an economic value greater than the contract rent, or that there was a lease advantage in favor of Flash. It is impossible to reconcile their opinion with the well reasoned and experience-backed testimony of Flash's witnesses above named, and we accept their opinion as controlling.
We question the accuracy of the computation of Mr. Williams as to value of property. We find he used an excessive useful life period of the buildings. He estimated a 33 year period. None of the other witnesses used such an extended period. Also, we find that he averaged contract rent to determine income. This was excessive, and erroneous.
*802 Mr. Perkins used a total useful life for the Texaco station of 33 years, but calculated a remaining life of 25 years, and a remaining life of 19 years for the Flash station with a depreciation rate on the Texaco station of three per cent and of four percent on the Flash station. This seems to conform more to the findings of the other witnesses. Also Mr. Perkins' used the actual contract rent, a lesser amount than Mr. Williams used, to compute value from the income approach. We find that Mr. Perkins' computations and opinion of fair market value to be the most accurate.
For these reasons, we find that the value of the land and improvements expropriated by plaintiff from defendant, Waldo S. Cockerham, to have a fair market value arrived at from the income approach calculated on the basis of contract rent of $147,960.
We find that the Texaco, Inc. lease had a market value at the time of taking of $16,671, and that the Flash Oil Corporation lease had a market value at the time of taking of $69,300.
Accordingly, the judgment of the trial court is amended to award Waldo S. Cockerham the sum of $147,960; Texaco, Inc. the sum of $16,671; and Flash Oil Corporation the sum of $69,300; all awards to include legal interest from date of taking until paid, less credit for all amounts heretofore paid to the respective defendants by the plaintiff.
This leaves the question of court costs levied against the plaintiff by the trial court in the amount of $5,700 to be disposed of herein. The expropriator is liable for these costs, and we find no error in the trial court's award. Plaintiff to pay all costs of court.
Judgment amended, and as amended, affirmed.