**STATE OF LOUISIANA, Through the SABINE RIVER AUTHORITY, State of Louisiana**

v.

**Fred Foster CARTER et al.**

**STATE OF LOUISIANA, Through the SABINE RIVER AUTHORITY, State of Louisiana**

v.

**Beulah Eloise CLANTON et al.**

**Civ. A. Nos. 11792, 11798.**

United States District Court
W. D. Louisiana,
Shreveport Division.

Dec. 23, 1968.

W. R. Jackson, Jr., Leesville, La., for plaintiff.

William H. Baker, Holloway & Baker, Jonesboro, La., Anthony Claude Leach, Jr., Leesville, La., J. Peyton Moore, Curator ad hoc, Shreveport, La., for Fred Foster Carter and others.

William H. Baker, Holloway & Baker, Jonesboro, La., Elias R. Kaufman, and Everett R. Scott, Jr., Kaufman, Anderson, Leithead, Scott & Boudreau, Lake Charles, La., J. Peyton Moore, Curator ad hoc, Shreveport, La., for Beulah Eloise Clanton and others.

OPINION ON REVIEW OF OBJECTIONS BY PLAINTIFF AND DEFENDANTS, LANDOWNERS, TO THE FINDINGS OF THE SABINE RIVER AUTHORITY LAND COMMISSION

BENJAMIN C. DAWKINS, JR., Chief Judge:

March 2, 1966, the State of Louisiana, through the Sabine River Authority, brought suit here seeking to expropriate full ownership of the land in question. Jurisdiction was asserted and accepted under 16 U.S.C. § 814 et seq., and the expropriation proceedings were based on La.Const. art. XIV, § 45 and La.R.S. 38:-2321 et seq.

Each tract of land involved in these proceedings was subject to a ninety-nine year timber lease, with an unexpired term of seventy-six years as of filing of the suit. Thus, two sets of rights were expropriated, those of the respective landowners and that of lessee, Continental Can Company, Inc. (Continental).

By order of this Court dated and issued March 2, 1966, the above entitled proceedings were referred to the Sabine River Authority Land Commission, a three-member Commission appointed by this Court under Rule 71A(h), F.R. Civ.P., for the purpose of determining just compensation due to persons whose interests were being expropriated.

At hearings held on March 30 and 31, 1966, for the *Fred Foster Carter* case, No. 11,792, evidence was introduced in behalf of the expropriating authority and Continental. Counsel for landowners introduced no evidence, and relied merely upon cross-examination of the witnesses for plaintiff and the timber lessee. At an evidentiary hearing held June 27, 1966, evidence was received in the *Clanton* case, No. 11,798, wherein the parties offered as a joint exhibit the entire record of *Carter*. Subsequently, August 29, 1966, both parties introduced the testimony from *Clanton* into the record of *Carter*. In its original opinion of November 28, 1966, and supplemental opinion of January 3, 1967, the Commission considered these two cases to have been consolidated and we shall do the same.

In its November 28, 1966, opinion, the Commission, as to which we have nothing but praise in execution of its duties, concluded that the value of the land in question was $70.00 per acre. It further concluded that the market value of the leases held by Continental was approximately $^{75}/_{85}$ths of the value of the land in each case as a unit. Thus $61.76 per acre, i. e., $^{75}/_{85}$ths of $70.00 was awarded to Continental; and $8.24 per acre, i. e., $^{10}/_{85}$ths of $70.00 was awarded to the Landowners. This produced total awards of $12,456.99 to Continental and $1,662.01 to Landowners in *Carter;* and $37,157.29 to Continental and $4,957.51 to Landowners in *Clanton.*

By order of this Court dated December 7, 1966, these cases were reopened for additional argument before the Commission. After reargument, on January 3, 1967, the Commission rendered a supplemental decision affirming in all respects its earlier decision. Before us now is judicial review of the findings of the Commission (Rules 71A(h); 53(e) (2), F.R.Civ.P.).

The specific issues presented are: (1) whether rentals for the timber leases in question were prepaid; (2) whether the Commission erred in setting the basic land value at $70.00 per acre; (3) whether the Commission improperly allocated the amount of the award between Landowners and lessee; and (4) whether legal interest of 5%, as provided by Louisiana law, should have been awarded from the date of the filing of the suit or the date of the judgment.

■ On the first issue, it really is uncontroverted, and we hold that full rentals for the timber leases were prepaid.

As to this point, Landowners quite tenuously urge that the $10.00 per acre initially paid by Continental to lessors was simply consideration for the then standing timber on the acreage, and that

its obligation to make annual payments of all property taxes, constituted consideration for each of the remaining ninety-eight years of the lease. Thus, argue Landowners, the contract was a timber sale with ninety-eight options resting with lessee to extend the lease by paying annual taxes.

■ The plain language of the contract in question makes it manifestly clear that $10.00 per acre was *"The PRICE and CONSIDERATION* for which this sale of the timber, wood and other forest products now growing on said property is made *and for which the lease and future operations and cutting privileges herein set out are granted."* (Emphasis added.) The obligation to pay annual rentals was one of several "conditions and stipulations." More specifically we conclude that it was a resolutory condition in each of the lease contracts; that is, one in which the occurrence or nonoccurrence, as the case may be, of the condition "operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed." [1] LSA–Civ. Code Art. 2045.

■ On the second issue, we hold that the Commission was acting fairly and impartially, and was supported therein by substantial evidence, in setting the basic value of the land in question at $70.00 per acre, including timber rights. There was ample evidence adduced before the Commission upon which to base that conclusion. We are of opinion that it is *not* our function, exquisitely and by way of "nit-picking," to rehash and reweigh that evidence. All that must appear is that there was substantial evidence to support the Commission's evidentiary findings, and that its awards were not "clearly erroneous." Rousseaux et al. v. United States of America, 394 F.2d 123 (5 Cir. 1968); Evans v. United States, 326 F.2d 827 (8 Cir. 1964); Buena Vista Homes, Inc. v. United States, 281 F.2d 476 (10 Cir. 1960); United States v. Glanat Realty Corp., 276 F.2d 264 (2 Cir. 1960).

■ The most seriously contested issue here is the third, which concerns proper distribution of the proceeds between the Landowners and lessee. We hold that, inasmuch as the highest and best use was as timberlands, the Commission quite correctly awarded $8.24 per acre to Landowners and $61.76 per acre to lessee.

Landowners argue that in addition to paying lessees the market value of its interest, the expropriator should have paid the Landowners the full amount of the value of the land in question, i. e., what it would have brought, unencumbered by the ninety-nine year leases, subject only to a deduction of $10.00 per acre, the amount of the prepaid rentals.

In their arguments, both to the Commission and to this Court, Landowners rely on State v. Ferris, 227 La. 13, 78 So.2d 493 (1955); In Re Morgan R. R. and S. S. Company, 32 La.Ann. 371 (1880); State Through Dept. of Highways v. Holmes, 209 So.2d 780 (La.App. 2d Cir. 1968); State Through Dept. of Highways v. Cockerham, 182 So.2d 786 (La.App. 1st Cir. 1965), writ refused 249 La. 110, 185 So.2d 219. Landowners especially rely on *Morgan* and *Cockerham.*

*Morgan* is the first and still the leading Louisiana decision dealing with the problem of determining the amount of recovery due to landowners and lessees following expropriation proceedings. There plaintiff expropriated a certain lot of ground in New Orleans. The owner had granted a three-year lease of the property at a stipulated rental of $60.00 per month, with the privilege granted to lessee to renew for an additional three

---

[1]. The last sentence of the third enumerated condition in each of the lease contracts reads:

"Failure of Buyer-Lessee to pay said taxes within said thirty (30) day period shall ipso facto terminate all ownership or rights of Buyer-Lessee and the obligation of Buyer-Lessee to pay said taxes shall thereupon be at an end."

years. The question before the court was how much, if anything, the expropriator owed the lessee for such expropriation.

Discussing the nature of the rights of the lessee, the Louisiana Supreme Court said:

"The rights of use, enjoyment, and disposal are said to be the three elements of property in things. They constitute the jura in re. The right of a lessee is not a real right, i. e., a jus in re. In other words, the lessee does not hold one of the elements of property in the thing. His right is a jus ad rem, a right upon the thing. While therefore, technically, the lease of real estate does not operate a divestiture of any elements of property, it does by the express terms of article 492 C.C. prevent or encumber the exercise of the right of perfect ownership. That article says that not only real rights but 'other rights,' vested in third persons, limit the exercise of full ownership. The right of a lessee is substantive, and is independent of changes in the ownership of the thing. C.C. 2733. The purchase or expropriation of the rights of the owner does not therefore necessarily embrace or operate upon the right of the lessee. That right in order to be affected must be itself the object of purchase or expropriation. If the rights of the owner are alone the objects of the purchase or expropriation, the right of lease is unaffected and continues. The purchaser gets only the thing encumbered by the lease. That is all he can get, for that is all the owner has. * * * "

The Court next discussed the value of the right taken from the lessee, saying:

"But the company has also demanded the expropriation of this right of the lessee—this encumbrance upon the full ownership. If that right is worth no more than the lessee has agreed to pay for it, then, as the price, or rent, in futuro, is yet to be paid, and as the company holding the owner's rights, is the payee thereof, the company would owe the lessee nothing. But if this right is worth more than the sum so agreed to be paid for it, the lessee is certainly entitled to be paid the amount of this excess. He must have the value of the right which is taken away from him.

"But it is said that the company having paid the owners the value of the property in full ownership, the amount to be allowed the lessee must be taken out of the sum awarded to the owners. This would be just in the case when the owners had received in advance the rents, and where the right of lease was worth no more than the sums paid for it. * * * "

*Cockerham,* a recent case dealing with rights of lessees following expropriation proceedings, perhaps more clearly than *Morgan,* discussed the manner of calculating the amount due the lessee, saying:

"Hence, in the expropriation of property encumbered with a lease, the rights of both the owner and the lessee must be reckoned with in acquiring perfect ownership. The owner, of course, must be paid the fair market value of the property taken; and the lessee must be paid the fair market value of any lease advantage he possesses. Two separate and distinct sets of rights are being acquired in the taking. Where an owner has granted a lease on the property taken, he is powerless to transfer to the expropriator any greater right of ownership than he possesses at the time. *The lessee, through the lease, has acquired certain rights on the property. These are entirely distinct from those retained unto the lessor. For the expropriator to acquire perfect ownership, he must expropriate the rights of the lessee, and in doing so, he must compensate the lessee the fair market value of those rights. The amount the expropriator owes the lessee is the monetary difference be-*

*tween the rent he has contracted by the lease to pay to the lessor and the price that the property would lease for at the time of the taking.* Stated another way: The expropriator owes the lessee the difference between the contract rent and the economic rent; the contract rent being that which the lessee contracted to pay to the lessor and the economic rent being that which the property would bring on the market at the time of the taking. The difference between these two amounts is what is called lease advantage. If there is a lease advantage, the expropriator must pay the value thereof to the lessee. *This amount is not owed by the owner to the lessee unless the owner has received the rent in advance or the value of the owner's property has been fixed in relation to the present actual value of the lease.* * * *"* (Emphasis added.)

Landowners contend that the Louisiana cases cited above, particularly *Morgan* and *Cockerham,* establish a single acceptable procedure for calculating the value of the lessee's interest, and that this matter should be remanded to the Commission for further consideration, because that procedure was not followed. We disagree.

In none of the cases cited above did the unexpired term of the leases even approach that involved here, seventy-six years, nor was the rental in any of those cases paid in advance. We do not see by what means the Commission should have strained itself to follow the dictates of those so significantly distinguishable cases. The import of these factual distinctions can be seen by comparing the situation of the landowners and lessees respectively in *Morgan* to those of the landowners and lessees here. In *Morgan,* the landowner's economic position at time of expropriation was far superior

to that of the lessee. There Landowner held property for which he stood in position to receive $60.00 per month (the contract rent) for the remainder of the contract term, which was less than six years, following which he would own the property free and clear of all encumbrances. From the lessee, the expropriator took nothing more than a "lease advantage" that amounted to an excess of the economic rent ($75.00 per month) over the contract rent ($60.00 per month), multiplied by the remainder of the lease term (something less than six years).

Here, at time of expropriation, the lessee stood in a far superior economic position to that of the Landowner, since the latter held nothing more than timber lands [2] subject to prepaid timber leases with unexpired terms of seventy-six years.[3]

Landowners further contend that the cases cited stand merely for the proposition that a landowner holding property subject to a prepaid lease is entitled to full value of the property free of any outstanding lease, or leases, less the amount of prepaid rentals. This is wholly without merit because it overlooks the elementary rule that one gets from the expropriator only the value of what is taken from him, in this case the land subject to a prepaid long-term lease. We find nothing in any of the cases cited suggesting, or importing, otherwise.

These cases, however, are important to us in that they emphasize that in an expropriation proceeding where land subject to lease is taken, two separate sets of rights are acquired by the expropriator, those of the landowner and those of the lessee. Thus the expropriator cannot focus narrowly on the value of Landowner interest, and expect the

2. The appraisers at the hearing were in full agreement that the primary value of the property was for timberland.

3. It might be that, as plaintiffs suggest, the leases here were merely legal maneuvers to accomplish the equivalent of a sale of the property with perpetual reservation of mineral rights to Landowners. However, we agree with the Commission that this is merely speculative and not relevant here.

lessee to derive his recompense from that award, or vice versa.

We hold, therefore, that the Commission acted in accordance with that rule.

Testimony at the hearing makes it clear that the leaseholder, Continental, held something which nearly was equal in value to full ownership of the land, diminished only slightly by the outstanding naked ownership. The Record also makes clear that the interest of Landowners was of very slight value compared with those of Lessees. Admittedly the Records before the Commission are not as complete as they might be with respect to value of Landowners' interests. This was not the Commission's fault. There is, however, more than sufficient evidence therein for a conclusion as to that value, upon which the Commission based its findings. The following quotation from the opinion of the Commission indicates the wide variety of factors it considered in deciding upon just compensation for the interests held by Landowners and Lessees:

"Using a ratio of $75/85$ths of the total land value as the value of the lease [the testimony of Mr. Peters, a witness for the lessee, was to the effect that he would recommend that a purchaser pay as much as $75.00 per acre for the lease, and that in his opinion the property was worth $80.00 to $85.00], and a value of $70.00 per acre for the basic land value, we arrived at a value of the lease of $61.76 and of $8.24 for the remaining landowners' interest. We have also considered the fact that 23 years of the lease have expired, and that 76 years remain upon the lease; the discounted value of $70.00 over the remaining 76 years of the lease, the fact that three crops of pulpwood or one and a half crops of saw logs could be grown during the remainder of the lease; the fact that the lessee has been paid for all the standing merchantable timber; the fact that premerchantable timber remains; the calculations by Mr. Redding; and after weighing all the possible methods of computing the value of each party's interest, and being limited by the evidence produced, we conclude that the value of $61.76 per acre to the lessee and $8.24 per acre to the landowner is a fair and equitable distribution."

Thus the fractional division of the basic land value, $70.00 per acre, was not unreasonable or inequitable; rather it represented the best available factual method of fully and fairly compensating both Landowners and Continental for their respective interests.

We hold, therefore, that the Commission's evaluation and computations were correct in all respects.

█ The final issue for consideration is whether legal interest should have been ordered from the date of filing of the suit rather than date of judgment. On the authority of State of Louisiana, Through Sabine River Authority v. Miller, 250 La. 668, 198 So.2d 397 (1967), which considered this precise point, we hold that interest must be computed from the date of this judgment.

A proper decree should be presented.