200 So.2d 733 (1967)
CENTRAL LOUISIANA ELECTRIC COMPANY, Inc., Plaintiff-Appellant-Appellee,
v.
Harry GAMBURG et al., Defendants-Appellees-Appellants.
No. 2023.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1967.
*735 Provosty, Sadler & Scott, by Nauman Scott, Alexandria, for plaintiff-appellant-appellee.
Stafford & Pitts, by Grove Stafford, Sr., Alexandria, for defendant-appellee-appellant.
Mansour & Lauve, by Lewis O. Lauve, Alexandria, for defendant-appellee-appellant.
Before FRUGE, TATE and HOOD, JJ.
HOOD, Judge.
This is an expropriation suit instituted by Central Louisiana Electric Company, Inc., in which plaintiff seeks to obtain a right of way for the construction and maintenance of an electric transmission line over and across a tract of land in Rapides Parish. The suit was instituted against Harry Gamburg, the owner of the property affected, and Albert Painter, the lessee of that property. Judgment on the merits was rendered by the trial court granting the servitude to plaintiff, awarding Gamburg the sum of $18,498.35 as the value of the property or rights taken and as severance damages, and rejecting the demands of the lessee, Painter. Plaintiff and defendant Painter have appealed.
Defendant Gamburg owns an irregular shaped tract of farm land in Rapides Parish, containing 585 acres. Approximately 25 acres of this property is unsuitable for farming purposes because of bayous, canals and a pipeline right of way on the land, but the rest of the property is suitable for farming, and at the time this suit was instituted about 560 acres were actually in cultivation. The land is described as low stiff land, which recently has been cleared of trees and underbrush and was planted or cultivated for the first time in 1966. All of the witnesses agree that the land is best suited for the purposes for which it is now being used, i. e., the cultivation of soybeans.
On November 29, 1965, Gamburg and Painter entered into a "Contract of Lease and Option to Purchase," under the terms of which Gamburg leased this 585 acre tract to Painter for a term of five years, beginning December 1, 1965, and ending November 30, 1970. The property was leased for farming purposes, and the contract provides that the lessee will pay to the landowner one-fifth of all crops grown and harvested on the property during the first year of the lease and one-fourth of the crops grown and harvested thereon during each remaining year of the lease. The contract also provides that during the first three years of the lease, that is until November 30, 1968, lessee shall have the option to purchase the leased premises for $240,000.00 in cash, provided that one-half of all minerals are to be reserved to the owner-lessor.
This expropriation suit was instituted on October 19, 1966. The right of way which plaintiff seeks is 100 feet wide, and it runs in a northwesterly-southeasterly direction a distance of 6,698 feet, across the entire length of and almost in the center of the Gamburg property. It runs parallel to an existing 50-foot pipeline right of way owned by Humble Oil Company, and *736 throughout the entire length of the servitude it overlaps 30 feet of the pipeline right of way. The amount of land included in the 100-foot servitude being taken here is 15.38 acres, 4.6 acres of which overlap the pipeline right of way and 10.78 acres of which lie outside of but adjacent to it. A farm road has been constructed on the pipeline right of way, and it runs along most of the length of that servitude.
Plaintiff proposes to construct a 230 KV electric transmission line over and along the right of way which is being sought. The line is to be supported by nine "H-frame" structures which are to be located about 700 feet apart on defendant's property. Each of these structures consists of two upright creosoted poles, with cross arms to which the wires are attached. The two poles which form a part of each such structure will be 17 feet apart, straddling the center line, and each will be 75 to 80 feet high. The cross arms will be 35 feet long, and the electric line which is to be supported by these poles will be 26 to 28 feet above the ground at the lowest point of the wires.
Defendants concede that plaintiff has the legal right to expropriate the servitude which it seeks, and that it has exercised reasonable discretion in determining the width and in selecting the location of that servitude. Plaintiff and defendant Gamburg have stipulated that the property had a value of $410.00 per acre at the time this suit was instituted.
After trial of the case on its merits the trial judge concluded that as compensation for the servitude which is being taken the landowner is entitled to 75 percent of the fee value of the land for the 10.78 acres of the servitude which does not overlap the pipeline right of way, and that he is entitled to 50 percent of the fee value of the land for the 4.6 acres which does overlap it. He thus awarded defendant Gamburg the sum of $4,257.85 as the value of the servitude which was expropriated.
The trial court also concluded that all of defendant's remaining property located outside the servitude being taken, consisting of 569.62 acres, has been damaged to the extent of $25 per acre as a result of the taking, and he thus awarded defendant Gamburg the additional sum of $14,240.50 as severance damages, making a total award of $18,498.35.
On this appeal plaintiff contends, first, that the trial judge erred in awarding the landowner 75 percent of the fee value of a portion (10.78 acres) of the land which is included in the right of way being expropriated. It argues that the award made to the landowner for the servitude being taken should be fixed at 50 percent of the fee value of the 15.38 acres included in the servitude, which amounts to $3152.90.
Plaintiff calls our attention to the fact that in Central Louisiana Electric Company v. Fontenot, 159 So.2d 738 (La.App. 3d Cir. 1964), where a servitude for an electric transmission line was expropriated, we determined that the value of such a servitude should be fixed at 50 percent of the fee value of the land included in that servitude. Plaintiff also notes that the Second Circuit Court of Appeal arrived at substantially the same conclusion in Louisiana Power & Light Company v. Greenwald, 188 So.2d 618 (La.App.2d Cir. 1966). In each of those cases, however, it was determined that after the taking the landowner would be able to make some substantial use of the property for the purpose for which it was best suited. In the Fontenot case, for instance, we said "* * * it is apparent from the evidence that he will continue to have the use of the property for farming and grazing purposes, being the uses for which it is best suited." And in the Greenwald case the court stated "Thus, he may continue with his farming operations in the same manner and for all practical purposes to the same extent as theretofore."
M. C. Gehr and Donald L. Chambers, expert real estate appraisers who were *737 called by plaintiff, testified that in their opinions the servitude being taken should be valued at 50 percent of the fee value of the land. R. A. Wolf, Jr., and H. B. Staples, expert appraisers called by defendant Gamburg, felt that a higher valuation should be placed on the servitude, Wolf being of the opinion that it should be valued at 80 percent of the fee value of the land, while Staples felt that the market value should be fixed at 60 percent of the fee value of the entire 15.38 acres being taken. Hab Monsur, an expert appraiser called by defendant Painter, appraised the servitude at 80 percent of the fee value of the property affected. The trial judge noted in his reasons for judgment that the experts called by plaintiff have had relatively little experience in dealing with farm lands, while defendant's witness, Wolf, has had extensive experience in buying, selling and developing farm property. Also, the evidence shows that both of the real estate experts called by defendant, Wolf and Staples, are presently managing farms where soybeans and other crops are being raised.
Three experienced soybean farmers, called by defendants, testified that in order to raise soybeans successfully it is necessary to spray frequently for noxious weeds and insects, and that the spraying is done most effectively by using airplanes. They feel that crops cannot be grown satisfactorily in the area included within the electric line right of way and that this area will become infested with weeds and insects, because of the difficulty encountered in spraying with airplanes under the electric wires and around the posts, and because of the inability to operate farm machinery near the poles. One experienced farmer called by plaintiff testified that crops could be raised successfully and with very little added cost on the property included in the right of way. We believe, however, that the evidence shows that the landowner will not be able to use the land included in the right of way being taken here for planting and raising row crops such as soybeans, that being the purpose for which it was best suited before the taking.
There is adequate evidence to support the finding of the trial court as to the value of the servitude taken, and we are unable to say that he erred in awarding the landowner 75 percent of the fee value of that portion of the servitude which lies outside the pipeline right of way. For that reason we will affirm the award made by the trial court to defendant Gamburg representing the value of the servitude expropriated.
Plaintiff contends next that no severance damages will be sustained by the defendant landowner as a result of the expropriation, and that the trial judge erred in awarding severance damages.
The two expert appraisers called by plaintiff felt that the remaining property owned by Gamburg would not be depreciated as a result of the taking. Elmer J. Descant, an experienced farmer who owns two farms over which electric transmission lines have been constructed, testified that he has experienced no difficulty in farming or in controlling pests on those two farms, although an electric line causes "a little bit more grass problem," and causes him to incur a little bit more expense in keeping the weeds down around the poles. He uses airplanes to spray generally, although he has to use hand labor to control the weeds around the poles, and he stated that he has noticed no decrease in yield because of the location of electric transmission lines on his property. James C. Smith, who operates a flying service, stated that the existence of an electric transmission line does not prevent him from spraying crops effectively under and near those lines, and that his planes constantly fly under the wires and near the supports so that complete coverage of the crops in the right of way is obtained.
The testimony of three farmers and an agronomist, called by defendants, is to the effect that it is impossible to effectively control insects or weeds under or within a *738 distance of 125 to 150 feet on either side of an electric transmission line, that the area under and near such a line becomes a refuge for insects and a nursery for weeds, that the insects and weeds spread to farm lands located up to 1000 feet or one-quarter mile on either side of the line, and that production thus is reduced within that area. One of these experienced farmers stated that the existence of the electric line would cause production in the adjacent areas, up to 1000 feet on either side of the line, to be reduced by approximately one-half, even with "attempted maintenance poisoning being done at the same time." Another testified that "any time that they leave any insects in there it cuts the yield."
Richard Pease, who is engaged in the aerial crop dusting business, testified that he will not guarantee effective coverage under an electric transmission line or within 35 to 40 feet on either side of that line. He stated that he avoids flying under the electric wires, and that even if his planes would fly under them he would be unable to get effective coverage because of the existence of the poles.
Both of the real estate appraisers called by defendant Gamburg are of the opinion that all of the latter's remaining property will be decreased in value at least $25.00 per acre. Mr. Monsur, the expert who was called by defendant Painter, is of the opinion that Gamburg's remaining property will be depreciated in value by five percent as a result of the taking, but he concedes that his experience with farming operations and in appraising farm property has been limited. Two of the farmers who testified stated that the value of the entire tract, as a row crop or soybean farm, would be substantially reduced if an electric transmission line were constructed across it, as proposed.
The trial judge, after carefully analyzing all of the testimony in his excellent reasons for judgment rejected the opinions expressed by the experts called by plaintiff. He concluded originally that that portion of defendant's remaining property which is located within 1000 feet of either side of the servitude would be depreciated in value to the extent of $25.00 per acre, and judgment was rendered on that basis, awarding Gamburg $7,690.00 as severance damages. A new trial was granted, however, and thereafter the trial judge amended his original decree to award the landowner as severance damages a sum equal to $25.00 per acre for the entire remaining 569.62 acres, thus increasing the award of severance damages to the sum of $14,240.50. In assigning reasons for this last judgment increasing the award for severance damages, the trial judge said:
"The experts who testified in the case all stated that the adverse effect of this electrical line insofar as being a breeding spot for noxious weeds and insects was on a gradual decreasing basis extending out from the right of way. Their evaluation of severance damage in the way of depreciation to the farm of $25.00 per acre took this into consideration. In other words because of the adverse effect of the electrical line through the middle of the farm, the whole farm is damaged, market wise, to the extent of $25.00 per acre. The evidence is that the total farm consists of 585 acres and the right-of-way will consume 15.38 acres giving a total acreage of 569.62 times $25.00, giving a total sum of severance damages of $14,240.50 rather than $7,690.00 as previously awarded."
The measure of severance damages is the difference between the market value of the remaining property immediately before the expropriation and its diminished market value immediately after the taking. The severance damages to the remaining property cannot be presumed, and such damages will not be awarded unless the owner shows by competent evidence that the remaining property has been diminished by the taking. State Through Department of Highways v. Dodge, 168 So.2d 430 (La.App.3d Cir. 1964); and *739 State Through Department of Highways v. Gani, 138 So.2d 683 (La.App.3d Cir. 1962, Cert. denied).
The trial judge's findings of fact, particularly those involving the credibility of the witnesses testifying before him, are entitled to great weight on appeal, and such findings will not be disturbed unless found to be clearly erroneous. Gulf Machine Shop v. Poynter, 192 So.2d 606 (La.App. 3d Cir. 1966).
In the instant suit we cannot say that the trial judge erred in rejecting the opinions as to severance damages expressed by plaintiff's experts and accepting the opinions of defendant's experts as to those damages. We conclude, therefore, that the award made by the trial court to defendant Gamburg as severance damages is supported by the evidence and that it should be affirmed.
Defendant Painter argues that he, as lessee, is entitled to be compensated for (a) the loss of the present value of the lease above the lease obligation, (b) the loss of production for the remaining four years of the lease, and (c) the loss of the present value of the option above the option price. He contends that the trial judge erred in refusing to award him the amounts claimed for these items.
Painter testified that in 1966 he cultivated 560 acres of soybeans on this property, that he averaged 35 bushels per acre, that the government support price for soybeans is $2.50 per bushel, and that he received more than the government support price for that portion of the crop which he had sold prior to the trial. He claims that if he had received only the government support price for his entire crop his gross income from production on this farm in 1966 would have been $49,000.00, and that the landlord's one-fourth share of that crop would have amounted to $12,250.00. He contends that prior to the filing of this expropriation suit this farm could have been leased on the open market for a rental of one-third of the crop, and that based on the 1966 production this higher rental would amount to $4,083.33 more than the rental he is presently obligated to pay under the existing lease. He claims that this additional rental which he could have obtained represented the "lease advantage" which he had prior to this expropriation, and that it would have amounted to $16,333.-32 for the four remaining years of the lease. He argues that as a result of the taking the property no longer can be rented for more than the rental stipulated in his current lease, that it thus has caused him to lose his lease advantage, and that the judgment appealed from should be amended to award him $16,333.32 as the present value of the lease above the lease obligation.
The lessee of real property under a recorded lease owns a "jus ad rem," a right upon the thing. In order for the condemning authority in an expropriation suit to acquire the full ownership of property encumbered by a recorded lease, it is necessary that the lessee be made a party to the suit and that the rights of the lessee, as well as those of the landowner, be acquired. See In Re Morgan R.R. & S.S. Co., 32 La.Ann. 371 (1880).
Where all of the property affected by a recorded lease is expropriated, the established rule is that the expropriator owes the lessee the difference between the "contract rent," i. e. the rental which is specified in the existing lease contract, and the greater "economic rent," that being the highest rental which the property would bring if offered on the open market at the time of the taking. The difference between these two amounts has been called the "lease advantage" of the lessee. In Re Morgan R.R. & S.S. Co., supra; State Through the Department of Highways v. Cockerham, 182 So.2d 786 (La.App. 1st Cir. 1965, Writ refused, 249 La. 110, 185 So.2d 219); State v. Ferris, 227 La. 13, 78 So.2d 493 (1955); State, Through Department *740 of Highways v. Levy, 242 La. 259, 136 So.2d 35 (1961).
The rule was stated by our Supreme Court in the case of In Re Morgan R.R. & S.S. Co., supra, as follows:
"But the company has also demanded the expropriation of this right of the lesseethis encumbrance upon the full ownership. If that right is worth no more than the lessee has agreed to pay for it, then, as the price, or rent in futuro, is yet to be paid, and as the company, holding the owner's rights, is the payee thereof, the company would owe the lessee nothing. But if this right is worth more than the sum so agreed to be paid for it, the lessee is certainly entitled to be paid the amount of this excess. He must have the value of the right which is taken away from him."
The same court held in State v. Ferris, supra, that a "sound guide for determining the rights of the lessee to compensation in expropriation proceedings" is the following:
"If the right of lessee is worth no more than he has agreed to pay in futuro for it, the expropriator of that right would pay him nothing, as it is worth nothing. But if the right of lease will bring a greater sum than it is to cost the lessee, the latter is entitled to be paid the amount of such excess, which amount cannot be charged upon the sum fixed for the rights of the owner unless the owner has received the rent in advance, or unless the value of his right has been fixed by reference to the present actual value of the lease." (Quoted from syllabus, In Re Morgan R.R. & S.S. Co., supra.)
In State, Department of Highways v. Cockerham, supra, our brothers of the First Circuit Court of Appeal appropriately stated:
"For the expropriator to acquire perfect ownership, he must expropriate the rights of the lessee, and in doing so, he must compensate the lessee the fair market value of those rights. The amount the expropriator owes the lessee is the monetary difference between the rent he has contracted by the lease to pay to the lessor and the price that the property would lease for at the time of the taking. Stated another way: The expropriator owes the lessee the difference between the contract rent and the economic rent; the contract rent being that which the lessee contracted to pay to the lessor and the economic rent being that which the property would bring on the market at the time of the taking. The difference between these two amounts is what is called lease advantage. If there is a lease advantage, the expropriator must pay the value thereof to the lessee. This amount is not owed by the owner to the lessee unless the owner has received the rent in advance or the value of the owner's property has been fixed in relation to the present actual value of the lease. If the value of the owner's rights have been determined in reference to the contract rent, the expropriator owes the lease for the value of his rights taken; however, if the value of the owner's rights have been fixed in reference to the economic rent, then the lessee's rights will be compensated for from the proceeds paid to the owner. If there is no lease advantage, the expropriator owes the lessee nothing. See: State, Through Department of Highways v. Levy, supra." (Emphasis added.)
And, in State Through the Department of Highways v. Levy, supra, the Supreme Court concluded that the defendant lessee was not entitled to an award because he failed to prove that he had a "lessee's advantage."
In each of the cases just cited there was a total taking. In the Morgan R.R. & S.S. Co. case and the Cockerham case the landowner was awarded the value of the property as determined by reference to the "contract rent" (i. e. by considering the income derived under the existing lease as *741 a basis of return on invested capital) and the lessee was awarded an additional amount for the loss of his lease advantage. In the Ferris case, as we understand the court's opinion, the landowner was awarded the market value of the property taken subject to the existing lease, and a separate award was made to the lessees for the loss of their lease advantage. In the first three cited cases the "economic rent" was greater than the "contract rent," and the lessee had a "lease advantage" which was lost as a result of the taking.
Unlike any of the cited cases, the instant suit involves a partial taking, and the value of the property affected by the lease was not determined by reference to the amount of rent which was stipulated in the existing lease. Plaintiff contends that the lessee is not entitled to an award of damages for a lease advantage where the lease is only partially destroyed, but that his only recourse is against the lessor under LSA-C.C. art. 2697. Also, if it should be determined that the lessee had a lease advantage which was destroyed by the taking, the question would be presented of how the amount owed by plaintiff for the rights taken and severance damages should be apportioned between the landowner and the lessee.
We find it unnecessary to consider the question of whether a lessee may recover where the lease is only partially destroyed, or the question of how the award should be apportioned between the landowner and the lessee, because we have concluded that defendant Painter has failed to establish that he had a lease advantage at the time this expropriation suit was filed.
None of the five expert real estate appraisers who testified expressed an opinion as to the market value of the lease or as to the highest rent which could have been obtained if the property had been offered for lease on the open market just prior to the taking. Defendant Painter testified that if he had been compelled to renegotiate the lease prior to this expropriation he would have been willing to pay one-third of the crop as rent, but that he would not agree to pay that rental after the construction of an electric line over the property. H. C. Ezell, Jr., a farmer, testified that he would be "willing to rent this piece of property as it is right now on a third," but that after the electric line is constructed he would not rent it for one-third of the crop "unless it would be a last resort" or "unless I couldn't do any better." Eugene Robinson, another farmer, when asked what rental he would have been willing to pay for this property as it was prior to the expropriation, testified, "It'd be worth a third since it has been went over and hand picked chunks and grubs," but that he "just wouldn't lease it with a high line on it." Elmer Descant, also a farmer, testified that he gets equally as high a yield from farm land with an electric line on it as from other lands without such a line. We interpret Descant's testimony to be that the existence of a high line on a farm would not be a material factor in determining the amount of rent he should pay for it.
There is no evidence in the record to the effect that anyone, including the above named farmers, ever made a bona fide offer to rent or lease this property for a rental of one-third the crop. And, no evidence was offered to show what the market value of this lease was at the time the suit was instituted, or what was the usual rent paid for the lease of row crop farm land such as this. To support his claim that the property could have been leased on the open market for a rental of one-third the crop, defendant Painter relies solely on the testimony of two witnesses and himself to the effect that before the suit was filed they would have paid such a rental but that they are unwilling to do so now.
In State Through the Department of Highways v. McDuffie, 240 La. 378, 123 So.2d 93 (1960), our Supreme Court held that offers to purchase property, even though found to be bona fide, are inadmissible as evidence of the market value in expropriation cases, because they are "inherently unreliable, being highly susceptible *742 to fabrication." The same court has held that "[o]ffers of purchase are a class of evidence safer to reject than to receive." Louisiana Ry. & Navigation Co. v. Morere, 116 La. 997, 41 So. 236 (1906); Texas Pipe Line Company v. Barbe, 229 La. 191, 85 So.2d 260 (1956). See also State Through the Department of Highways v. Henderson, 138 So.2d 597 (La.App.3d Cir. 1962); Robertson v. Louisiana Fruit Growers Association, 80 So.2d 190 (La. App.2d Cir.1955); State Highway Com'n v. Triangle Development Co., 369 P.2d 864 (Wyo.1962); Nichols on Eminent Domain, Third Edition, Sec. 12.311 (2), pp. 87 et seq. and Sec. 21.4 (1), pp. 300 et seq.; and 31A C.J.S. Evidence § 182 (3), p. 469 et seq.; and 27 Am.Jur.2d, Eminent Domain, Sec. 428, p. 326.
We agree with the following statements made by the author of a leading text on eminent domain with reference to offers tending to show the value of land:
"It is, at most, a species of indirect evidence of the person making such offer as to the value of the land. He may have so slight a knowledge of the subject as to render his opinion of no value. Oral and not binding offers are so easily made and refused in a mere passing conversation, and under circumstances involving no responsibility on either side, as to cast no light upon the question of value, and they are unsatisfactory, easy of fabrication and even dangerous. While all of these objections might not apply in every case it is thought best by most courts to reject evidence of offers altogether." [Nichols on Eminent Domain, Third Edition, Vol. 4, Section 12.-311 (2).]
It is apparent from the above cited authorities that offers for the purchase or lease of real property, even though such offers are found to be bona fide, constitute unreliable proof and are not admissible in evidence. The evidence in the instant suit is actually much weaker than that in any of the cited cases, because here the evidence does not show that an offer of any kind was ever made for the lease of the subject property for a rental of one-third the crop. The only admissible and reliable proof which appears in the record tending to show the rental value of the property is the lease which is presently in effect on such property. According to the evidence, therefore, the economic rent and the contract rent of this property are the same.
In this suit the burden rests on the defendant lessee to prove that he had a lease advantage, and that he sustained a loss of that advantage as a result of the taking. The burden imposed on the lessee is to establish his claim to a legal certainty and by a reasonable preponderance of the evidence. Speculation, conjecture, mere possibility and even unsupported probability are not sufficient to support a judgment. State, Through Department of Highways v. Levy, supra; Gulf States Utilities Company v. Hatcher, 184 So.2d 326 (La.App. 1st Cir.1966).
Our conclusion in the instant suit is that the defendant lessee has failed to establish that the economic rent was greater than the contract rent as to this property, or that he had a lease advantage at the time of the taking. We find no error in the judgment rendered by the trial court, therefore, insofar as it rejected Painter's claims for damages for loss of the present value of the lease above the lease obligation.
The trial judge assigned as reasons for rejecting the lessee's demand for loss of production for the remaining four years of the lease that such an award would be too speculative and uncertain. Some of the factors which he considered in arriving at that conclusion were "disease to the plants and the fruit, insects, weather, perserverance of the farmer, continual government support for the fruit and market value of the fruit which in future years may be greater or lesser than it was this year." We agree with these observations made by the trial judge. Also, we note that the evidence *743 does not show whether soybeans can be raised on the same property during each of the next four years, without rotation of crops. Painter testified that he plans to raise wheat and corn on the same property during the next four years, and this creates some additional uncertainty as to the loss of crops which he alleges he will sustain.
We agree with the trial judge that the evidence fails to establish that defendant Painter will sustain a loss of production during the next four years. We base our decision solely on the lack of evidence tending to show that the lessee will sustain any damage for loss of crops, and we express no opinion as to whether a lessee under any circumstances has the legal right to recover for loss of crops for future years in an expropriation suit.
Finally, defendant Painter contends that he, as the holder of an option for the purchase of the property, should be compensated for the loss of the present value of the option resulting from the expropriation of a part of the property affected by it.
As we have already noted, at the time of the taking defendant Painter owned an option to purchase the parent tract for the sum of $240,000.00, or for a price of approximately $410.00 per acre. Painter contends that at the time this suit was instituted the property actually had a market value of $430.00 per acre, or a total value of $251,550.00. His option, therefore, gave him the right to purchase the property for $11,550.00 less than its market value. He contends that the property has been diminished in value as a result of this expropriation to the extent that its value is now less than $410.00 per acre, and thus he has sustained a loss of his "option advantage," or $11,550.00, and that he is entitled to be compensated for that loss. He concedes that the total amount plaintiff should be condemned to pay for the rights taken and for severance damages is $18,498.35. He argues, however, that this award should be apportioned between the landowner and the lessee, the landowner to receive $6,948.35 and the lessee to receive $11,550.00.
Five expert real estate appraisers testified at the trial. One of them felt that the parent tract had a market value of $400.00 per acre at the time this suit was instituted. Three of these appraisers testified that in their opinion it had a value of $410.00 per acre. The remaining appraiser, Hab Monsur, who was called by defendant Painter, testified that in his opinion the property had a market value of $430.00 at the time of the taking. The trial court noted, however, that Mr. Monsur had erroneously evaluated the land as having potential subdivision possibilities, and "for this reason the court does not accept the evaluation placed upon the land by Mr. Monsur." In addition to the fact that all appraisers, other than Monsur, valued the property at $410.00 per acre, or less, plaintiff and the defendant landowner stipulated that the market value of the property at the time of the taking was $410.00 per acre.
The evidence convinces us, as it did the trial court, that the market value of the property at the time of the taking did not exceed the price which was stipulated in the option agreement. Painter, therefore, did not have an "option advantage," and he thus did not sustain a loss as a result of the taking. For these reasons we concur in the conclusion reached by the trial court that Painter is not entitled to an award for the loss of the present value of the option above the option price.
For the reasons hereinabove set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.